**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ramon RODRIGUEZ and Michael
Buttigieg, Defendants-Appellants.**

No. 78–5108.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 9, 1978.

Decided April 13, 1979.

Richard G. Chosid, West Bloomfield, Mich., for defendants-appellants.

James K. Robinson, U. S. Atty., Detroit, Mich., Robert F. Helfand, Christopher A. Andreoff, Asst. U. S. Attys., Detroit, Mich., for plaintiff-appellee.

Before LIVELY and MERRITT, Circuit Judges, PHILLIPS, Senior Circuit Judge.

MERRITT, Circuit Judge.

This is one of a growing number of cases in which evidence of crime has been discovered in the course of a search of baggage or parcels consigned to commercial carriers for shipment.[1] The issue is whether the Dis-

---

1. *United States v. Fannon*, 590 F.2d 794 (9th Cir. 1979) (*en banc*); *United States v. McDaniel*, 574 F.2d 1224 (5th Cir. 1978); *United States v. Haes*, 551 F.2d 767 (5th Cir. 1977); *United States v. Humphrey*, 549 F.2d 650 (9th Cir. 1977); *United States v. De La Fuente*, 548 F.2d 528 (5th Cir.), *cert. denied sub nom. Sierra v. United States*, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977); *United States v. Sherwin*, 539 F.2d 1 (9th Cir. 1976) (*en banc*); *United States v. Entringer*, 532 F.2d 634 (8th Cir.), *cert. denied* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976); *United States v. Kelly*, 529 F.2d 1365 (8th Cir. 1976); *United States v. Ford*, 525 F.2d 1308 (10th Cir. 1975); *United States v. Newton*, 510 F.2d 1149 (7th Cir. 1975); *United States v. Issod*, 508 F.2d 990 (7th Cir. 1974), *cert. denied* 421 U.S. 916, 95 S.Ct. 1578,

trict Court erred by denying defendants' motion to suppress narcotics which were discovered when employees of Emery Air Freight Co. opened a parcel delivered to Emery by defendant Rodriguez for shipment to defendant Buttigieg. Both defendants were convicted of conspiracy to possess narcotics with intent to distribute,[2] and Buttigieg was also convicted of the underlying substantive offense.[3] We affirm the convictions.

## I.

On May 13, 1976, Rodriguez delivered a package to the Emery Air Freight office in Los Angeles for shipment to Buttigieg in Detroit. Rodriguez appeared nervous in the Emery office. He hesitated when asked to note the contents of the package on the freight bill, and he was emphatic that the package be held at Emery's Detroit office for pick-up by Buttigieg. In the suppression hearing. Emery's Los Angeles agent testified that Rodriguez' behavior made him suspicious that the contents of the package might not be film equipment as stated on the freight bill. The Emery agent notified his supervisor of his suspicions. When the supervisor was unable to confirm the address of either the sender or the addressee, he, too, became suspicious. He shook the package and determined that it apparently did not contain film equipment. The Emery employees then opened the package. Inside, under a layer of newspaper, was a large, sealed, plastic trash bag. Inside the trash bag were a number of transparent plastic bags each of which contained a brown, powdery substance. There was also a quantity of talcum powder loose in the trash bag. The Emery employees then called the Los Angeles Police Department, described what they had discovered and asked an officer to come investigate. Upon arrival at the Emery office, Officer Stirwalt saw the partly opened box. With the aid of the Emery employees, he removed some of the contents. A field test revealed that the powder was not heroin. Stirwalt smelled the powder to see if it had the ether-like odor characteristic of Phencyclidine (PCP). The substance did not smell of ether.

Stirwalt believed that the brown powder was narcotics anyway. His belief was based upon the circumstances surrounding the delivery to Emery, on the substance's appearance, and on the fact that talcum powder had been used in the packaging, a practice common among drug shippers wishing to deceive the noses of dogs trained to detect narcotics. Stirwalt, therefore, took the package, without Emery's objection, to the police laboratory where it was determined that the brown powder was, indeed, PCP. An ounce of PCP was removed and kept by the Los Angeles police. The rest was repackaged and shipped on American Airlines to Detroit where it was received by Drug Enforcement Administration agents who removed most of the PCP and replaced it with rocks. The package was resealed and delivered to Emery's Detroit office where Buttigieg picked it up. At no time did the law enforcement officers obtain a warrant to search or seize the package or its contents.

The District Court ruled that the drugs were admissible on the theory that (1) the

43 L.Ed.2d 783 (1975); *United States v. Pryba*, 163 U.S.App.D.C. 389, 502 F.2d 391 (1974), *cert. denied* 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 898 (1975); *United States v. Ogden*, 485 F.2d 536 (9th Cir. 1973), *cert. denied* 416 U.S. 987, 94 S.Ct. 2392, 40 L.Ed.2d 764 (1974); *United States v. Valen*, 479 F.2d 467 (3d Cir. 1973), *cert. denied* 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974); *United States v. Wilkerson*, 478 F.2d 813 (8th Cir. 1973); *United States v. Echols*, 477 F.2d 37 (8th Cir.), *cert. denied* 414 U.S. 825, 94 S.Ct. 128, 38 L.Ed.2d 58 (1973); *United States v. Burton*, 475 F.2d 469 (8th Cir.), *cert. denied* 414 U.S. 835, 94 S.Ct.

178, 38 L.Ed.2d 70 (1973); *United States v. Cangiano*, 464 F.2d 320 (2d Cir. 1972), *vacated on other grounds* 413 U.S. 913, 93 S.Ct. 3047, 37 L.Ed.2d 1023 (1973); *United States v. Wilson*, 392 F.2d 979 (9th Cir. 1968); *Wolf Low v. United States*, 391 F.2d 61 (9th Cir.), *cert. denied* 393 U.S. 849, 89 S.Ct. 136, 21 L.Ed.2d 119 (1968); *Gold v. United States*, 378 F.2d 588 (9th Cir. 1967); *Corngold v. United States*, 367 F.2d 1 (9th Cir. 1966) (*en banc*).

**2.** 21 U.S.C. § 846 (1976).

**3.** 21 U.S.C. § 841(a)(1) (1976).

initial search by Emery was purely private and beyond the scope of the exclusionary rule, and (2) the government's subsequent warrantless activities were not unlawful due to the consent and plain view exceptions to the fourth amendment's warrant requirement.

On appeal, defendants make three arguments. First they claim that Emery's search, by virtue of extensive federal regulation of air carriers, was not purely private and, therefore, governed by the fourth amendment and the corollary rule of exclusion. Second, defendants claim that, even if Emery's search was purely private, the tests conducted by police at the Emery office constituted a new and different government search which cannot be justified by any exception to the warrant requirement. Finally, defendants argue that the warrantless seizure of the package by police was likewise not justified by any exception to the warrant requirement and, therefore, was illegal. The government argues in response that their failure to get a warrant was justified by the consent and plain view exceptions to the warrant requirement.

## II.

■■■ Our fourth amendment [4] analysis of these facts leads us to conclude: (1) the inspection by the air freight carrier constitutes a *private* search not governed by the

warrant and probable cause requirements of the fourth amendment, and (2) the seizure of the package by the police was permissible under the "plain view" exception to the warrant requirement. We explain the reasons for these conclusions in the remainder of the opinion.

### A. The Distinction Between Private and Governmental Searches

The Supreme Court has declined to erode the rule that the fourth amendment applies only to government searches and does not apply to private searches, unless a government agent participates directly in the private search.[5] The Court has stuck by the rule for fifty years, despite ample opportunity to modify it.[6] The air carrier's inspection of the defendant's box in this case was a private search under this rule.

The recently enacted federal statute [7] which governs the authority of air freight carriers to inspect parcels for dangerous items does not convert the search from a private to a governmental search. The new statute in fact limits the carrier's private, common law authority to open packages. The statute provides that any "agreement for the carriage of . . . property . . by an air carrier . . . shall be deemed to include an agreement that such carriage shall be refused when consent . . . to inspect such property . . . is not given." [8]

---

4. The fourth amendment provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." U.S.Const. amend. IV.

5. *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). *See generally* Note, *Airport Freight and Passenger Searches: Application of Fourth Amendment Standards*, 14 W & M L.Rev. 953, 963–66 (1973); Note, *Airport Security Searches and the Fourth Amendment*, 71 Colum.L.Rev. 1039, 1041–47 (1971); Note, *Seizures by Private Parties: Exclusion in Criminal Cases*, 19 Stan.L.Rev. 608 (1967).

6. *United States v. Janis*, 428 U.S. 433, at 456 n.31, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Irvine v. California*, 347 U.S. 128, 136, 74 S.Ct. 381, 98

L.Ed. 561 (1954); *McGuire v. United States*, 273 U.S. 95, 99, 47 S.Ct. 259, 71 L.Ed. 556 (1927).

7. Air Transportation Security Act of 1974, Section 204, 49 U.S.C. § 1511 (1976).

8. Section 204 of the act reads:
   (a) The Administrator shall, by regulation, require any carrier, intrastate air carrier, or foreign air carrier, to refuse to transport—
   (1) any person who does not consent to a search of his person, as prescribed in section 1356(a) of this title, to determine whether he is unlawfully carrying a dangerous weapon, explosive, or other destructive substance, or
   (2) any property of any person who does not consent to a search or inspection of such property to determine whether it unlawfully contains a dangerous weapon, explosive, or other destructive substance.

At the common law, the authority of the carrier to inspect was not tested in the context of search and seizure cases[9] but rather by writs allowing actions for conversion. Although, at early common law, carriers apparently lacked authority to inspect packages,[10] modern courts have recognized the carrier's right to inspect.[11] That right has been held to exist for the following purposes: detection of insurance fraud,[12] detection of rate cheating by improper declaration of contents,[13] inventory and identification of unclaimed baggage and parcels,[14] insulation of the carrier from criminal liability,[15] ensuring that the carrier's property is not used in the commission of a crime,[16] and protection of the carrier's and other shipper's property.[17]

█ The new federal statute in no way expands this traditional, common law authority of carriers to open and inspect packages. Indeed, it seems to limit this authority by permitting inspection only after the shipper has been notified that the carrier might open the shipment. Thus, the statute does not operate as a federal grant of power to carriers which might turn their conduct into government activity. Moreover, there is no suggestion that the government or police agent encouraged the search or participated in it.[18] It was therefore a purely private search by the carrier to which the fourth amendment exclusionary rule does not apply.[19]

## B. Third Party Consent as an Exception to the Warrant Requirement

The carrier gave the police access to the package. They inspected it and took it away without a warrant. They looked at it on the carrier's premises, smelled it, tested it and believed, but could not prove scientifically, that it was narcotics. They took

Subject to reasonable rules and regulations prescribed by the Administrator, any such carrier may also refuse transportation of a passenger or property when, in the opinion of the carrier, such transportation would or might be inimical to safety of flight.

(b) Any agreement for the carriage of persons or property in air transportation or intrastate air transportation by an air carrier, intrastate air carrier, or foreign air carrier for compensation or hire shall be deemed to include an agreement that such carriage shall be refused when consent to search such persons or inspect such property for the purposes enumerated in subsection (a) of this section is not given. 49 U.S.C. § 1511 (1976).

9. The exclusionary rule did not exist at common law. See J. Wigmore, Evidence §§ 2183–84 (McNaughton ed. 1974).

10. Carriers merely could refuse carriage if the consignor would not state the nature of the goods. *Riley v. Horne*, 5 Bingham's Rpts. 217, 2 Moore & Payne's Rpts. 331 (1828); *Brass v. Maitland*, 6 Ellis & Blackburn's Rpts. 470 (1856); *Parrott v. Wells, Fargo & Co.* (The Nitro-Glycerine Case), 15 Wall. 524, 82 U.S. 524, 21 L.Ed. 206 (1872). *See generally* J. Ridley, The Law of Carriage of Goods by Land, Sea & Air, (Shaw & Sons, London, 3d ed. 1971) pp. 15–17.

11. *Adams Express Co. v. Commonwealth*, 129 Ky. 420, 112 S.W. 577, 580 (Ky.App.1908) (". . . if the carrier believes upon reasonable grounds that it is contraband . . . and, if an inspection is reasonable and practicable under the circumstances, may require an inspection.") is the earliest reported case we have found which recognizes a right to inspect.

12. *People v. McGrew*, 1 Cal.3d 404, 82 Cal. Rptr. 473, 462 P.2d 1 (1969).

13. *United States v. Averell*, 296 F.Supp. 1004 (E.D.N.Y.1969).

14. *United States v. Echols*, 348 F.Supp. 745 (E.D.Mo.1972), *aff'd* 477 F.2d 37 (8th Cir.), *cert. denied* 414 U.S. 825, 94 S.Ct. 128, 38 L.Ed.2d 58 (1973).

15. *United States v. Pryba*, 163 U.S.App.D.C. 389, 502 F.2d 391 (1974), *cert. denied* 419 U.S. 1127, 95 S.Ct. 815, 42 L.Ed.2d 898 (1975).

16. *People v. McKinnon*, 17 Cal.3d 899, 103 Cal. Rptr. 897, 500 P.2d 1097 (1972).

17. *Id.*

18. *See, e. g., Corngold v. United States*, 367 F.2d 1 (9th Cir. 1966) (*en banc*).

19. In *United States v. Fannon*, 590 F.2d 794 (9th Cir. 1979) (*en banc*), the court reached the same conclusion on similar facts, reasoning that "Congress did not intend to require that air freight shipments be subjected to the security screening process mandated by the government for passengers and their carryon possessions." at 796. *See also United States v. Freeland*, 562 F.2d 383, 385 (6th Cir.), *cert. denied* 434 U.S. 957, 98 S.Ct. 484, 54 L.Ed.2d 315 (1977).

it—with the carrier's permission—to the police station for further tests. The government seeks to justify its failure to obtain a warrant by the consent exception to the warrant requirement.

The principles underlying the third party consent cases decided by the Supreme Court and the lower federal courts are unclear. Where a third party has possession or some right of control over the property of another which constitutes incriminating evidence and the third party, without the owner's consent, gives it or shows it to the police, or allows a police search or seizure, fourth amendment analysis has varied widely. The courts alternately have said that third party consent means (1) there was no government search or seizure;[20] (2) there was a government search or seizure, but it was reasonable because the relationship of the parties to the property was such that the owner, by leaving the evidence with another "assumed the risk" that the other might allow police to look at or take the property;[21] and (3) there was a government search or seizure, but it was unreasonable because the owner did not assume the risk that another would allow the police to search or seize the property.[22]

In the instant case, we find it impossible to say that there was no government search or seizure. The police took the contents out of the box for inspection and field testing and then carried it away for further tests. Nor can we say that the defendant who shipped the narcotics "assumed the risk" that the carrier would allow the police to search and seize the package, which had been opened for inspection in apparent violation of the federal law requiring advance notification of the carrier's right to do so. No such notice was given in the contract of carriage or otherwise.[23]

## C. The "Plain View" Exception to the Warrant Requirement

■ The foregoing discussion leads us to the conclusion that the evidence should be suppressed unless for some other reason the purposes of the warrant requirement or the purposes of the exclusionary rule have been satisfied. The purpose of the warrant requirement is to slow down the police by requiring them to write down their reasons for a neutral magistrate to pass on before they intrude on the privacy or property rights of the citizen.[24] The purpose of the exclusionary rule is twofold: to prevent unlawful police conduct in the future,[25] though not unlawful private conduct; and to preserve the integrity of the judicial process by not having the judiciary, as one arm of the government, condone the wrongful conduct of another arm of the government.[26] The question, then, under both the warrant requirement and the exclusionary rule is whether the police officers acted

20. *Coolidge v. New Hampshire, supra* note 6, 403 U.S. at 487, 91 S.Ct. 2022; *United States v. Sherwin,* 539 F.2d 1, 7–8 (9th Cir. 1976) (*en banc*); *United States v. Pryba, supra* note 15, at 401.

21. *United States v. Matlock,* 415 U.S. 164, 171 n.7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte,* 412 U.S. 218, 245–46, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 731, 22 L.Ed.2d 684 (1969).

22. *United States v. Kelly,* 529 F.2d 1365, 1371 (8th Cir. 1976). *Cf. Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964) (". . . a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures [which] would disappear if it were left to depend upon the unfettered discretion of an employee of the hotel.")

23. The Emery employee who first became suspicious of the package testified that Emery's tariff, filed with the Civil Aeronautics Board, provides, in Rule 35, that "All shipments are subject to inspection by the forwarder." The Emery agent admitted, however, that he did not inform defendant Rodriguez of this tariff provision. Transcript, 8/8/77, at p. 41. Moreover, the government failed to introduce the air freight bill which might have given the shipper notice of tariff Rule 35.

24. *McDonald v. United States,* 335 U.S. 451, 455, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

25. *E. g. United States v. Janis, supra* note 6, 428 U.S. at 446, 96 S.Ct. 3021.

26. *United States v. Calandra,* 414 U.S. 338, 355–59, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (Justices Brennan, Douglas and Marshall dissenting).

wrongfully and in a way that we should want to prevent in the future.

In addition to the consent and "exigent circumstances"[27] exceptions to the warrant requirement, police are excused from obtaining a warrant under the exception for "wasted motion" known as the "plain view" doctrine. The record indicates that the package was open when the police first saw it. Inside, the officers could see a substance which they thought was narcotics. They removed items from inside the box and then proceeded to remove, for testing purposes, some of the powder contained in one of the plastic bags which had been opened by the Emery employees. They then took the package to the police station for further testing.

An object in plain view may be inspected and seized without a warrant if (1) the officer is lawfully present, (2) the object is in plain view, and (3) its incriminating nature is immediately apparent.[28] The defendants argue only that the incriminating nature of the package's contents was not immediately apparent. We disagree. Here the police knew the following when they first glanced into the opened box: the contents looked like narcotics packaged in plastic bags ready for sale; the shipper had lied to the carrier about the contents; and the packages were garnished with talcum powder, a red-herring device used by drug dealers to fool the olfaction of police hounds.[29] Plainly, this satisfies the requirement that the incriminating nature of the evidence be immediately apparent.[30] The fact that the initial field tests were inconclusive did not make the incriminating nature of the powder less obvious; it merely meant that further laboratory tests were necessary to prove scientifically what police already had ample cause to believe.

Although we should like to prevent the conduct of the carrier in this case because the carrier opened the box without securing the shipper's consent as required by statute, we may not use the exclusionary rule for this purpose. Under current doctrine, we must not be swayed by the illegality of the carrier's search.[31] Given that, we find nothing wrongful about the police conduct that followed. The police do not have to get a warrant to investigate a call that a carrier may have found contraband. Once they arrive they need not get a warrant to seize the package if the "incriminating nature of the object is immediately apparent" from plain view observation. That was the case here. The police conduct therefore was not wrongful and admission of the evidence does not sully the hands of the judiciary.

Accordingly, the judgment of conviction of the District Court is affirmed.

---

**27.** See *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *United States v. Finazzo*, 583 F.2d 837, 845–48 (6th Cir. 1978).

**28.** *Coolidge v. New Hampshire, supra* note 6, 402 U.S. at 464–73, 91 S.Ct. 2022.

**29.** See *United States v. Chadwick*, 433 U.S. 1, 3, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

**30.** *Effler v. Rose*, 535 F.2d 980 (6th Cir.), cert. denied 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976); *United States v. Truitt*, 521 F.2d 1174 (6th Cir. 1975); *United States v. Gray*, 484 F.2d 352 (6th Cir. 1973), cert. denied 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974).

**31.** See notes 5 and 6 *supra* and accompanying text.