UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard John BARRY,
Defendant-Appellant.

No. 80–5352.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 23, 1981.

Decided March 19, 1982.

Rehearing Denied May 17, 1982.

David Segal, New York City, J. Brooke Lathram, Burch, Porter & Johnson, Memphis, Tenn., for defendant-appellant.

W. J. Michael Cody, U. S. Atty., Timothy R. DiScenza, Memphis, Tenn., for plaintiff-appellee.

Before EDWARDS, Chief Circuit Judge, · MARTIN, Circuit Judge, and FEIKENS,[*] Chief District Judge.

BOYCE F. MARTIN, Jr., Chief Judge.

Barry was convicted by a jury of possessing a schedule II controlled substance (Methaqualone) with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

The District Court denied Barry's motion to suppress evidence allegedly seized in violation of the Fourth Amendment. The evidence, four bottles containing the controlled substance, was introduced at trial and formed the basis for his conviction. Barry now argues it was error: 1) to deny the suppression motion; and 2) to admit telephone records offered as evidence to show the requisite intent under the charge.

Barry was arrested by agents of the Drug Enforcement Administration on January 24, 1980 after he claimed a package at the Memphis, Tennessee office of Federal Express, a private freight carrier. On the previous day, the package had arrived at the Memphis Federal Express airport facility in a damaged condition. The package was referred to a company service agent who, under normal circumstances, would have taken it to a "rewrap area." However, through a small hole in the parcel, the agent could see four bottles containing pills. Suspecting contraband, the agent called a security manager, Mr. Crump, who took the

---

[*] Honorable John Feikens, Chief Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

package to his office and opened it. He found inside four large bottles of pills, each labeled "Methaqualone." Although Methaqualone may be possessed legally, Crump's suspicions were raised by the large quantity of pills and by the fact that the pharmaceutical numbers had been effaced. He then called the Drug Enforcement Agency which sent two agents to his office. After examining the package and its contents, the agents took five pills for testing. The tests were positive. Agents then resealed the package and returned it to Federal Express. Barry was arrested when he attempted to claim the package.

At the suppression hearing, Barry contended that the search by Federal Express was conducted for purposes of federal law enforcement and was therefore not a private search under *Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). In *Burdeau* the Supreme Court held that the safeguards against warrantless searches and seizures did not extend to searches undertaken by private parties. Whatever evidence a private citizen might lawfully or otherwise obtain from another individual can, upon its transfer to the government, be used against that individual. The Fourth Amendment, said the Court, secures citizens against only governmental action. It does not prevent the government from using evidence which has fortuitously fallen into its hands. 256 U.S. at 475, 41 S.Ct. at 576. In denying suppression of the pills, the District Court held that the Federal Express investigation was a valid private search conducted under normal company procedures.

Barry also contended at the hearing that confiscation of the pills samples by the DEA constituted a separate governmental search or seizure. According to Barry, this warrantless seizure was illegal because it did not fall within the "plain view" exception to the Fourth Amendment's warrant requirement. Although the pills themselves were in plain view, the fact that they were contraband was not immediately obvious because the agents had to test the pills to confirm that they were in fact Methaqualone. In addition, Barry argued that the

inadvertence requirement to this exception was not satisfied. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The District Court disagreed, concluding that the DEA's search was valid under the plain view doctrine. Barry now attacks this conclusion and argues as well that the private search rule of *Burdeau* was applied incorrectly to the facts of this case.

## I.

To support his contention that the search by Federal Express constituted a governmental rather than a private search, Barry cites a number of cases involving the silver platter doctrine. *Gambino v. United States*, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927); *Lowrey v. United States*, 128 F.2d 477 (8th Cir. 1942); *Sutherland v. United States*, 92 F.2d 305 (4th Cir. 1937). He argues by analogy that Federal's search effectively circumvented the Fourth Amendment. The Supreme Court enunciated a test in *Gambino* to prevent federal agents from evading the warrant requirement by acting in concert with state police. The Court stated that challenged searches should be reviewed to determine whether the state authorities had, when seizing evidence, acted on behalf of the state or whether they had acted only to assist federal law enforcement officers. In the latter circumstances, the actions of the state agents would be characterized as federal and the constitutional warrant requirements applied to the search. *Id.* at 314, 315.

For example, in *Gambino*, liquor seized in a warrantless search by state police was ruled inadmissible in a prosecution under the National Prohibition Act. Because the state prohibition law had been repealed, the Court found that the state troopers had acted only for purposes of federal law enforcement. 275 U.S. at 316, 48 S.Ct. at 138. The Court reached this conclusion despite the absence of any evidence of participation by federal authorities in the search. The Court focused entirely upon the search's purpose:

We are of opinion that the admission in evidence of the liquor wrongfully seized violated rights of the defendants guaranteed by the Fourth and Fifth Amendments. The wrongful arrest, search, and seizure were made solely on behalf of the United States. The evidence so secured was the foundation for the prosecution and supplied the only evidence of guilt. It is true that the troopers were not shown to have acted under the directions of the federal officials in making the arrest and seizure. But the rights guaranteed by the Fourth and Fifth Amendments may be invaded as effectively by such co-operation as by the state officers acting under direction of the federal officials.

\* \* \* \* \* \*

The prosecution thereupon instituted by the federal authorities was, as conducted, in effect a ratification of the arrest, search, and seizure made by the troopers on behalf of the United States. (citations omitted)

*Id.* at 316–17, 48 S.Ct. at 138.

Barry argues that Federal Express agents opened his parcel solely to check for illegal drugs and therefore acted on behalf of the government. As proof of the nexus between Federal Express and the DEA, he offers a memorandum prepared by the company in conjunction with the DEA. It requests all employees to cooperate in an effort to detect illegal drug shipments. However, employees are told that they should open suspicious packages only if they have valid company policy reasons for doing so. Otherwise, cautions the memo, the owners of the packages could claim that their constitutional rights have been violated. In addition, the memorandum lists specific criteria designed to profile drug parcels.

■ One could view this document as an attempt by the DEA to coach Federal Express employees to conduct searches that will meet the private search test of *Burdeau.* Barry invites us to draw this inference. However, this inference is not exclusive. On its face, a memorandum asking employees to follow company policy is be-

nign. Thus, although this memorandum does evidence the company's desire to assist the DEA, it alone does not cloak the company's actions with a federal purpose. Barry's package was pulled from the mainstream of thousands of parcels because it had been damaged. The company had a policy of diverting damaged packages to a resealing center. Thus the package originally came under special scrutiny for private reasons of company policy.

The fact that Federal Express subsequently became suspicious of its contents and exposed the contraband does not render the search federal. The suspicions arose only because of a fortuitous work-related event: the diversion of the package to the resealing center. Thereafter Federal Express performed its duty by preventing the interstate transportation of illegal drugs. We therefore find that the search of Barry's parcel was private and hence not subject to the warrant requirement of the Fourth Amendment. *Burdeau v. McDowell, supra.*

We recognize that a limit exists to the extent public objectives can be hidden behind ostensibly private ones. Private freight carriers perform a quasi-public function and must do so in a manner consistent with the public trust. If a carrier opened packages randomly or perhaps because they matched the criteria of a drug profile, we would be concerned about the abuse of that trust in the name of law enforcement. But that was not the case here. We therefore reject Barry's contention that Federal Express conducted a governmental search.

## II.

We must now determine whether the subsequent seizure by the DEA of pill samples from Barry's open parcel violated his Fourth Amendment rights. Currently, the Supreme Court's interpretation of the law of search and seizure reveals that evidence should not be suppressed unless it was seized by means of: a) unlawful conduct on the part of law enforcement authorities

which b) violated the Fourth Amendment rights personal to the defendant. The latter criterion has been employed with increasing frequency to derail the exclusionary rule. Until recently cases which have explored these two factors have done so under the rubric of standing. *See e.g. Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). If a defendant could not show that unlawful police conduct violated his *own* Fourth Amendment rights, he would be denied standing to complain of the alleged violation and the tainted evidence would be admitted. One important fact emanates from these cases: the exclusionary rule will not be applied in every instance of unlawful police conduct. Deterrence of official misconduct is a primary objective of the rule. However, exclusion of valuable probative evidence is in some cases too high a price to pay for a slight increase in police discipline. Thus where unlawful police conduct can be separated from a fair appraisal of the defendant's Fourth Amendment rights, the law will ignore a minor deviation from proper, constitutionally mandated police procedure. Recently the Supreme Court made this point in *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980):

> [The] cases also show that these unexceptional principles do not command the exclusion of evidence in every case of illegality. Instead, they must be weighed against the considerable harm that would flow from indiscriminate application of an exclusionary rule.

Thus, the exclusionary rule "has been restricted to those areas where its remedial objectives are most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). The Court has acknowledged that the suppression of probative but tainted evidence exacts a costly toll upon the ability of courts to ascertain the truth in a criminal case. *E.g., Rakas v. Illinois, supra*, 439 U.S. [128], at 137–138, 99 S.Ct. [421], at 427–28 [58 L.Ed.2d 387]; *United States v. Ceccolini*, 435 U.S. 268, 275–279,

98 S.Ct. 1054, 1059–61, 55 L.Ed.2d 268 (1978); *Stone v. Powell*, 428 U.S. 465, 489–491, 96 S.Ct. 3037, 3050–51, 49 L.Ed.2d 1067 (1976); see *Michigan v. Tucker*, 417 U.S. 433, 450–451, 94 S.Ct. 2357, 2367, 41 L.Ed.2d 182 (1974). Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury. *E.g., Stone v. Powell, supra*, 428 U.S., at 485–489, 96 S.Ct., at 3048–3050; *United States v. Calandra, supra*, 414 U.S., at 348, 94 S.Ct., at 620. After all, it is the defendant, and not the constable, who stands trial. (footnote omitted).

*Id.* at 734, 100 S.Ct. at 2445.

Moreover, the Supreme Court has recognized that the analysis of whether the defendant's own constitutional rights have been violated need not be undertaken solely in terms of standing. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Instead "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment rather than on any theoretically separate but invariably intertwined concept of standing." *Id.* at 139, 99 S.Ct. at 428. The test developed in *Rakas* asks whether one has a "legitimate expectation of privacy" in the place searched or the items seized. *Id.* at 143, 99 S.Ct. at 430. A succinct restatement of the principles established in *Rakas*, which summarizes the analysis that must be undertaken in considering such a claim, is found in Mr. Justice Blackman's concurring opinion in another recent Fourth Amendment "standing" case, *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980):

> In my view, *Rakas v. Illinois*, 439 U.S. 128 [99 S.Ct. 421, 58 L.Ed.2d 387] (1978), recognized two analytically distinct but "invariably intertwined" issues of substantive Fourth Amendment jurisprudence. *Id.*, at 139 [99 S.Ct. at 428]. The first is "whether [a] disputed search or seizure has infringed an interest of the defendant which the Fourth Amendment

was designed to protect," *id.*, at 140 [99 S.Ct. at 429]; the second is whether "the challenged search or seizure violated [that] Fourth Amendment righ[t]," *ibid.* The first of these questions is answered by determining whether the defendant has a "legitimate expectation of privacy" that has been invaded by a governmental search or seizure. The second is answered by determining whether applicable cause and warrant requirements have been properly observed.

I agree with the Court that these two inquiries "merge into one," *ante*, at 106 [100 S.Ct. at 2562], in the sense that both are to be addressed under the principles of Fourth Amendment analysis developed in *Katz v. United States*, 389 U.S. 347 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967), and its progeny. But I do not read today's decision, or *Rakas*, as holding that it is improper for lower courts to treat these inquiries as distinct components of a Fourth Amendment claim. Indeed, I am convinced that it would invite confusion to hold otherwise. It remains possible for a defendant to prove that his legitimate interest of privacy was invaded, and yet fail to prove that the police acted illegally in doing so. *And it is equally possible for a defendant to prove that the police acted illegally, and yet fail to prove that his own privacy interest was affected.* (emphasis added).

*Id.* at 111–112, 100 S.Ct. at 2565.

We appreciate this concern over dividing the preceding analysis. For a court to continue to ask whether the Fourth Amendment has been violated after finding that police have illegally seized evidence invites the conclusion that one branch of government is condoning the illegality of another. This unseemly result can be avoided by manipulating the order in which the two factors are considered, in that both illegal conduct and a privacy violation must be found before the exclusionary rule will be applied. Therefore the absence of one factor will obviate the need to consider the other. However, because the inquiry regarding police conduct is, in contrast to the privacy question, governed by relatively fixed rules, we cannot help but believe that the first question will, and perhaps should, address the legality of the police conduct.

### A.

The government argues that the District Court correctly concluded that the DEA's warrantless seizure fell within the plain view exception to the warrant requirement. *See Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). However, the facts of this case present a situation in which although the exception seems to be implicated, it does not in fact apply. The following statement from *Coolidge* disposes of the government's argument:

> The limits on the doctrine are implicit in the statement of its rationale. The first of these is that plain view *alone* is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent "exigent circumstances." Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure.
>
> The second limitation is that the discovery of evidence in plain view must be inadvertent. The rationale of the exception to the warrant requirement, as just stated, is that a plain-view seizure will not turn an initially valid (and therefore limited) search into a "general" one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is

constitutionally cognizable in a legal system that regards warrantless searches as "per se unreasonable" in the absence of "exigent circumstances." (footnote omitted).

*Id.* at 470–71, 91 S.Ct. at 2040.

To apply the plain view exception here would be to make the obvious mistake warned against in *Coolidge*. Plain view is but one requirement of the exception. Absent the others, a warrant is necessary. Plain view is a particularly dangerous exception because, as Justice Stewart noted, "[I]n the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure." *Id.* at 465, 91 S.Ct. at 2037 (emphasis in original). The rule of *Coolidge* is that anytime a warrant may be obtained it must be. What the police may consider to be a waste of time in a clear case of overwhelming probable cause is at a minimum the preservation of one's right to have possessions seized pursuant to a limited warrant which exactly details its own scope and effect.

■ It is unquestionable that the DEA could have gotten a warrant here. Certainly probable cause was no barrier for they knew, based on reliable information, that Methaqualone awaited their arrival. Furthermore, no exigent circumstances excused their failure to procure a warrant. Barry's parcel was not due until the next day. The DEA had more than sufficient time to seek a warrant. The DEA's seizure was neither inadvertent nor exigent. Therefore, it was unlawful.

We turn now to discuss our decision in *United States v. Rodriguez*, 596 F.2d 169 (6th Cir. 1979), upon which the lower court relied to justify the DEA's seizure under the plain view exception. We believe there the court in *Rodriguez* faced a slightly different situation. In *Rodriguez*, we upheld the warrantless seizure of contraband shipped via common carrier because three elements co-existed: 1) the officer was lawfully present; 2) the object was in plain view; and 3) its incriminating nature was immediately apparent. *Id.* at 175.

The exigent circumstances and inadvertence requirements we mentioned previously are conspicuously absent from the discussion in *Rodriguez* of the plain view exception. However, *Coolidge* requires us to analyze a "plain view" seizure in light of these criteria. *Rodriguez* did not eliminate these factors from the plain view exception. Rather, the court in *Rodriguez* emphasized other factors upon which that particular case turned. Although not expressly discussed, exigent circumstances and inadvertence were necessary and were subsumed in the court's analysis. In the present case, however, the government and the District Court should not have relied on *Rodriguez* because the government failed to establish the threshold requirements: exigent circumstances and inadvertence.

### B.

■ Having determined that the DEA unlawfully seized the pill samples, we must reverse the District Court's order and suppress the samples as well as the remainder of the tainted Methaqualone, unless we determine that Barry had no reasonable expectation of privacy in the contraband at the time of the seizure. We first note that while Barry was charged with possession, that alone does not provide the necessary privacy interest. *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). [overruling the "automatic standing" rule of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)]. Yet the refusal of the Supreme Court to tie Fourth Amendment rights to "arcane" distinctions developed in property law, *Salvucci, supra,* 448 U.S. at 91, 100 S.Ct. at 2552, works both ways. We will not deny Barry a privacy interest solely on the often advanced principle that one can have no legitimate property interest in contraband. *See e.g., United States v. Jeffers*, 342 U.S. 48, 52–53, 72 S.Ct. 93, 95–96, 96 L.Ed. 59 (1951); *United States v. Emery*, 541 F.2d 887, 890 (1st. Cir. 1976). Disregarding property law however, places the court in something of a vacuum. Determining what is a legitimate privacy interest is a broad question whose answer perhaps depends most upon how

and to whom it is asked. Certainly Barry never expected the DEA to view the drugs when he ordered his supplier to send them via Federal Express. But just as certainly no reasonable man could expect to remain free from governmental intrusion after the package was damaged and its contents exposed in shipment. As a fair middle ground, we feel the best analysis focuses on the risks Barry undertook when he committed the Methaqualone to Federal's care.

To begin our analysis we must recognize that the most dangerous aspect of trafficking in narcotics lies not at the point of purchase of sale, where at least the confrontation is face to face, but lies instead in the distribution. This is especially true where the drugs have been consigned to a third person for shipment. During that period, the principals have relinquished all control over items which could lead to their arrest. Should the drugs be exposed, and if their nature as contraband is immediately apparent, they must know that their arrest will follow. Their privacy interest then is dependent upon two factors: the risk of exposure and the incriminating appearance of the contraband. The former is an external factor beyond the control of either of the two parties embroiled in the Fourth Amendment litigation. Yet the possibility that Federal Express would for some purpose open the package, be it for reasons of security, an accident, or damage, is a risk that must, or at least should have been considered by Barry when he decided to use their services. Barry chose to accept this risk. That decision could only serve to reduce his subjective expectation of privacy in the parcel he consigned.

The second factor, the incriminating nature of the materials shipped, was within the control of Barry and his supplier. They could have taken greater precautions to disguise the shipment. They chose not to. Instead, they shipped a large quantity of pills in clear bottles which were plainly labeled Methaqualone. In addition, the prescription numbers on the labels had been effaced. In light of Barry's failure to take precautions to protect his privacy interest from the risk of exposure inherent in his

bailment, we find that he had no reasonable expectation of privacy in his drug parcel.

The foregoing analysis is supported by *Rawlings v. Kentucky, supra.* In that case the Supreme Court found no legitimate privacy interest remaining in drugs which the defendant had placed in a companion's purse that was subsequently emptied at the instruction of the police. Because the defendant had not taken "normal precautions to maintain his privacy" in the course of the "sudden bailment" and could not exclude others from the purse, the Court declined to suppress the contraband seized pursuant to a defective warrant. *Id.* 448 U.S. at 105, 100 S.Ct. at 2561. In our view, Barry, through his bailment to Federal Express, similarly placed the Methaqualone beyond his control and suffered a reduction in the scope of privacy he could reasonably expect.

■ Finally, Barry argues that such additional precautions were unnecessary because the DEA had to test the pills to confirm that they were in fact Methaqualone. The test itself, according to Barry, constituted a separate search, and a further invasion of privacy, which in turn required a warrant. As support, he cites two recent Supreme Court decisions: *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). In each of these cases the Court found that although the government had lawfully come into possession of certain contraband items, the respective owners retained a protected privacy interest in the evidence at the time of its seizure.

*Walter* involved the FBI's warrantless screening of obscene films which had been turned over to the agency by a private party. It was apparent from the explicit labels and suggestive titles that these films were pornographic. Nevertheless, the Court held that the owners had a protected privacy interest in the films themselves because a further judicial inquiry was necessary to determine whether they were in fact obscene. The labels alone were insufficient to support a conviction. 447 U.S. at 654, 100 S.Ct. at 2400.

Similarly, in *Sanders*, the police lawfully acquired a suitcase which they had reason to believe contained marijuana. However, citing the owner's expectation of privacy in the unopened bag, the Court held that the police violated the Fourth Amendment when they opened it without first obtaining a warrant. 442 U.S. at 764–5, 99 S.Ct. at 2593. This anticipated the Court's position in *Walter* when it noted that ever since *Ex parte Jackson*, 96 U.S. 727, 24 L.Ed. 877 (1878), it has been recognized that lawful possession of sealed packages does not confer upon the government the right to conduct a warrantless search of its contents. *Walter, supra*, 447 U.S. at 654, 100 S.Ct. at 2400.

We find both of these cases distinguishable. *Walter* turned on the fact that the material seized was protected by the First Amendment. The chemical testing of Barry's pills was simply not an investigation on the scale required in *Walter* to adjudge the obscenity of the films. It was at most routine. For the same reason *Sanders* is not applicable. When the suitcase was seized, the officers could not tell by its appearance alone that it contained contraband. Discovering the concealed marijuana required a search separable from the seizure of the suitcase. The same cannot be said of the perfunctory test conducted here by DEA.

In conclusion, we hold Barry's Fourth Amendment rights were not violated. The District Court properly denied his motion to suppress the Methaqualone.

### III.

■ Finally Barry challenges certain evidentiary rulings of the trial court. Specifically, he cites as error the admission of telephone records of calls made to Tampa, Florida, the point of shipment, prior to his receipt of the parcel, and of evidence of previous pickups of packages shipped to him from Tampa. We find no abuse of discretion on the part of the trial court. *United States v. Jenkins*, 525 F.2d 819, 824 (6th Cir. 1975). The evidence was relevant to the element of the indictment which charged that petitioner knowingly accepted an illegal shipment of drugs and therefore was properly admitted pursuant to Rules 401 and 402 of the Federal Rules of Evidence.

Judgment affirmed.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge, dissenting.

This case seems to me to be governed by the result of the United States Supreme Court majority in *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). That case involved the unauthorized exhibition of films as to which there was reason to believe that they might be found to be obscene. This case involved the warrantless and, hence, unauthorized seizure and chemical analysis of pills as to which there was reason to believe that they might be illegally possessed controlled substances. In both instances I believe that the Fourth Amendment required a search warrant before the federal investigative procedure was carried out.

In *Walter*, the opinion of Justice Stevens, seemingly concurred in on this issue by the majority of the Court, said as follows:

It is perfectly obvious that the agents' reason for viewing the films was to determine whether their owner was guilty of a federal offense. To be sure, the labels on the film boxes gave them probable cause to believe that the films were obscene and that their shipment in interstate commerce had offended the federal criminal code. But the labels were not sufficient to support a conviction and were not mentioned in the indictment. Further investigation—that is to say, a search of the contents of the films—was necessary in order to obtain the evidence which was to be used at trial.

The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents. Ever since 1878 when Mr. Justice Field's opinion for the Court in *Ex parte Jackson*, 96 U.S. 727 [24 L.Ed. 877], established that sealed packages in the mail cannot be opened without a warrant, it has been settled that an officer's authori-

ty to possess a package is distinct from his authority to examine its contents. See *Arkansas v. Sanders*, 442 U.S. 753, 758 [99 S.Ct. 2586, 2589, 61 L.Ed.2d 235]; *United States v. Chadwick*, 433 U.S. 1, 10 [97 S.Ct. 2476, 2482, 53 L.Ed.2d 538]. *Walter v. United States, supra* at 654–55, 100 S.Ct. at 2400 (footnote omitted).

Since the *Rodriguez* case, (*United States v. Rodriguez*, 596 F.2d 169 (6th Cir. 1979)) discussed in Judge Martin's opinion was decided before this court had the benefit of the Supreme Court's opinion in *Walter v. United States, supra*, in my view it cannot govern our current decision.

I would reverse the judgment of the District Court.