[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 18, 2003
THOMAS K. KAHN
CLERK

————————————————

No. 01-16118

————————————————

D. C. Docket No. 92-00083-CR-FTM-29

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAYMOND DAVID YOUNG,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

**(November 18, 2003)**

Before BLACK and FAY, Circuit Judges, and HUCK[*], District Judge.

FAY, Circuit Judge:

_____

[*]Honorable Paul C. Huck, United States District Judge for the Southern District of
Florida, sitting by designation.

Defendant Raymond D. Young ("Young"), who has been convicted of 18 counts of conspiring to impede and impair the IRS in the computation and collection of diesel motor fuel excise taxes, subscribing to false quarterly excise tax returns, making false statements to an IRS agent and using false documents in connection with the review by an IRS agent of a 637 tax free certificate, raises eight challenges to his conviction and subsequent sentencing. Included among his various challenges, Young contends that the district court erred in denying his motion to suppress evidence obtained by the IRS when it conducted a warrantless search of Federal Express packages addressed to him. We affirm Young's conviction and sentence in all respects, and specifically find that, when Young and his co-defendants elected to ship the ill-gotten proceeds of their tax fraud scheme through Federal Express despite explicit warnings on the airbill and envelopes that (1) sending cash was illegal, and (2) Federal Express retained the right to inspect any package for any reason, defendants had no legitimate expectation of privacy in the contents of the packages.

## I.

IRS regulations regarding federal excise taxes deem the sale of gasoline and diesel fuel for "on-road" use to be taxable. Sales of these fuels for "off-road" and marine use are not taxable. Businesses that are eligible to buy fuel tax-free, such

as marinas, wholesale distributors and refineries, must first obtain a "637 certificate" from the IRS.

In April 1989, Young applied for a 637 certificate and indicated on his application that his business, Dry Tortugas Marina ("DTM"), was a marine retailer headquartered in Marco Island, Florida, that would engage in the business of buying and selling fuel. Young also stated to an IRS agent around this time that he owned an oceangoing vessel that he would use to fuel fishing boats on the high seas. The IRS granted DTM a 637 certificate in September 1989. As it turned out, Young never planned on using his vessel for the stated purpose. Indeed, four months prior to obtaining his certificate, Young sold the vessel.

Young proceeded to use the 637 certificate to purchase fuel tax-free from wholesalers, and resold the fuel – generally in cash-only transactions – to various retailers (such as truck stops, grocery stores and service stations) and trucking companies. As these sales were all for "on-road" uses, all were taxable pursuant to IRS regulations. Not surprisingly, DTM did not provide invoices to its cash sale customers, and all records regarding these sales were destroyed. On DTM's 1990 form 720s – which businesses selling fuel are required to submit quarterly – Young claimed that DTM owed no federal excise taxes for fuel purchases and sales.

As Young's scheme involved large and frequent cash transactions, DTM

employees in Texas would send the cash proceeds to Young in Florida via Federal Express two to three times per month. In late 1990, IRS Agent Ruka was alerted to these large cash shipments and began a preliminary investigation to determine if enough information existed to conduct a criminal investigation. Suspecting a scheme to launder narcotics proceeds through the sale of diesel fuel, Agent Ruka brought in IRS Agent Sutherland, who had expertise in this line of business. Agent Sutherland immediately noticed that DTM was due for its two-year review of its 637 certificate, and began a civil investigation in that regard. In preparation for the review, Young employed a customs house broker to prepare invoices and bills of lading for all of the cash sales. DTM employees also contacted its various fuel customers and induced them to sign certificates falsely stating that they were using fuel for tax exempt purposes.

It was during his first review meeting with Agent Sutherland, on April 30, 1991, that Young made overtures to Sutherland to lead the agent to believe he was being offered a bribe. As a result, IRS Inspections Service (a branch of the IRS that conducts internal affairs investigations) asked Sutherland to wear a wire during the subsequent meeting between the two, on May 31, 1991, which he agreed to do. During the second meeting, Young presented Sutherland with the newly-minted invoices, which the agent immediately found to be suspicious as all

4

appeared to be identical despite the fact that they spanned transactions over a two-year period. At the third and final meeting between Young and Agent Sutherland, Sutherland informed Young that the IRS was revoking his 637 registration until his marine fueling business was in operation.

In the meantime, Agent Ruka continued his investigation of Young. As part of this investigation, Agent Ruka contacted Federal Express operations manager Joseph Oldock and asked if Federal Express would permit IRS agents and U.S. Customs to view packages bearing Young's and co-defendant Ahmed's names. After contacting his local safety and legal departments, Oldock agreed to cooperate with the IRS. Without a search warrant, Federal Express turned over, and the IRS x-rayed, several of the packages. Fourteen packages were x-rayed by the IRS and found to contain large amounts of currency. These results were then used to obtain four search warrants in Florida and Louisiana, which were used to open two of the currency-laden packages and to search Young's place of residence and business in Marco Island.

During the trial, co-defendants Thomas Roettele and Mohammed Ahmed moved to suppress evidence obtained when the IRS intercepted and x-rayed the Federal Express packages. The district court denied the motion, finding that the defendants could not have a reasonable expectation of privacy concerning the

5

contents of the packages. Recognizing that a container, such as a Federal Express package, may not normally be searched without a warrant, the court nevertheless held that warnings on Federal Express packaging that shipping cash was prohibited, together with a notice on the airbill that the company retained the right to inspect packages, rendered unreasonable any expectation of privacy defendants had in the packages. Although Young raises various issues on appeal, we believe that the denial of this motion to suppress is the only issue that merits discussion.

## II.

Though defendants Ahmed and Roettele moved the district court to suppress evidence on the grounds that the search of the Federal Express packages by IRS agents violated their Fourth Amendment rights, Young never asserted this theory in his own motion to suppress. Accordingly, we review the district court's ruling for plain error. *United States v. Sentovich*, 677 F.2d 834, 837 (11th Cir. 1982).

## III.

The district court found compelling the testimony of Federal Express employee Joseph Oldock, in which he explained that the Federal Express airbill, which was utilized by defendants in shipping each of the fourteen packages, identified in its terms and conditions on the reverse that Federal Express may open and inspect packages at any time. The court determined that this notice, in

6

conjunction with the warning on the Federal Express envelopes which read, "Do not send cash," diminished any reasonable expectation of privacy defendants had in the packages. Young now challenges the district court's conclusion, and submits that the seizure and subsequent search of the packages violated his rights under the Fourth Amendment.

A.

The district court relied heavily on *United States v. Barry* in reaching its decision. 673 F.2d 912 (6th Cir. 1982). In *Barry*, defendant sought to suppress contraband observed by Federal Express employees in a damaged package turned over to the DEA. *Id*. at 913-14. The package, which contained a large quantity of prescription pills with the pharmaceutical numbers effaced, was damaged en route, exposing the contraband inside. *Id*. Federal Express employees searched the package and then contacted the DEA, whose agents proceeded to examine its contents without first obtaining a warrant. *Id*. at 914. The court determined that defendant's privacy interest depended on two factors: the risk of exposure and the incriminating appearance of the contraband. *Id*. at 919. With respect to the first factor, the court found that Barry should have considered the risk of exposure when he shipped the package with Federal Express – that is, the possibility that Federal Express would open the package for security reasons, an accident or

damage – and choosing to accept this risk reduced his "subjective expectation of privacy in the parcel he consigned." *Id.* As to the second factor, the court noted that the incriminating nature of the materials shipped was a factor within Barry's control, and thus he could have taken greater precautions to disguise the shipment, but instead shipped a large amount of pills in clear bottles plainly labeled with the name of the drug. *Id.* Thus, the court held:

> In light of Barry's failure to take precautions to protect
> his privacy interest from the risk of exposure inherent in
> his bailment, we find that he had no reasonable
> expectation of privacy in his drug parcel.

*Id.*

Though the facts of *Barry* differ from those here – in that the Federal Express agents initiated and conducted the initial search themselves – the Sixth Circuit does suggest that the act of shipping the contraband with a private carrier without taking proper precautions to "disguise the shipment" would, in and of itself, eliminate any reasonable expectation of privacy the defendants had in the package. However, *Barry* does not stand alone. It seems to us that the Sixth Circuit's decision in *Barry* must be considered in the context of the Supreme Court's decision in *Jacobsen* – a decision rendered two years after *Barry*. *United States v. Jacobsen*, 466 U.S. 109 (1984).

The facts of *Jacobsen* are virtually identical to those in *Barry*. Employees of

8

a private freight carrier, during their examination of a damaged package, observed a white powdery substance. *Id*. at 111. Upon this discovery, the employees summoned a federal agent, who extracted some of the powder and subjected it to a chemical test that demonstrated it was cocaine. *Id*. The Court ultimately determined that defendant Jacobsen, as in *Barry*, lacked any reasonable expectation of privacy in the package. *Id*. at 119. The reasoning, however, differed in key respects from that of the Sixth Circuit. Significantly, the Supreme Court recognized that packages shipped with private carriers are "effects" within the meaning of the Fourth Amendment, and further noted:

> Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable. Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package.

*Id*. at 114. Defendant's privacy interest in this particular package was eliminated, the Court determined, when the Federal Express employees examined it and:

> [O]f their own accord, invited the federal agent to their offices for the express purpose of viewing its contents. The agent's viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment.

*Id*. at 119. Thus, though the Supreme Court ultimately reached the same

9

conclusion as the Sixth Circuit, its reason for finding that the defendant lacked a privacy interest in his package stemmed from the fact that the third party opened it of its own accord, and the government agents merely repeated a search that was already conducted by the private party. The Supreme Court acknowledged *Barry*, and while neither adopting nor rejecting its test for determining a person's privacy interest in a package, narrowed its holding to the fact that the private shipper initiated and conducted the initial search.

Here, too, the Federal Express packages were "effects" in the context of the Fourth Amendment, and therefore defendants presumptively possessed a legitimate expectation of privacy in their contents. Per *Jacobsen*, this privacy interest would have been eliminated had the Federal Express employee inspected the package, discovered the currency and then contacted the IRS agents to replicate the search. This did not happen. Instead, the IRS agents initiated contact with Federal Express, obtained the packages, and x-rayed them off-site, all without first obtaining a warrant.[1] Thus we are dealing with a warrantless government search, and not a private search as in *Barry* and *Jacobsen*. *Cf. United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000) (search of UPS package was a government search

---

[1]The use of an x-ray device to project electronic emanations through an object and reveal, in picture form, the shape of the objects within the package constitutes a search within the meaning of the Fourth Amendment. *United States v. Haynie*, 637 F.2d 227, 230 (4th Cir. 1980), *cert. denied*, 451 U.S. 972 (1981).

where government agent actively encouraged UPS employee to open package, and employee did so because she was influenced by encouragement).

However, though we believe *Jacobsen* must be considered, our facts differ significantly. As part of the contract, and on the reverse side of each and every Federal Express airbill utilized by defendants we find the following notice:

**RIGHT TO INSPECT**

> We may, at our option, open and inspect your packages
> prior to or after you give them to us to deliver.

These airbills were placed in the front pouch of each of the large "Fed Ex Pak" envelopes used to ship the currency. Just above this pouch was a plainly visible warning, in all capital letters, which read: "DO NOT SEND CASH."

We believe that the presence of the above-quoted notice and warning removes this case from the ambit of post-*Jacobsen* jurisprudence. Simply put, this bold, unqualified "right to inspect" renders our factual scenario here irreconcilably different from *Jacobsen*. It appears to us that the terms and conditions of the contracts between Federal Express and its customers have probably changed since the Supreme Court's 1984 decision.[2] In addition, we are convinced that if the Court had been faced with the explicit notice present here, its decision would have

---

[2]Notations on the airbills themselves reflect such periodic revisions. Each airbill in the record before us contains a note in the bottom right corner indicating either "Rev. 1/91" or "Rev. 8/89."

11

been otherwise.[3]

This is best illustrated by returning to *Katz*, the Supreme Court's earlier expectation of privacy test. *Katz v. United States*, 389 U.S. 347 (1967). First, *Katz* requires that we ask whether defendants' actions exhibited an actual (i.e., subjective) expectation of privacy. *Id*. at 361 (Harlan, J., concurring). As Young and his cohorts sealed the money in closed containers they undoubtedly were trying to hide the contents from the world. They certainly had a subjective expectation (or hope) of privacy. Second, we question whether this subjective expectation is one "that society is prepared to recognize as 'reasonable.'" *Id*. We think not. No reasonable person would expect to retain his or her privacy interest in a packaged shipment after signing an airbill containing an explicit, written warning that the carrier is authorized to act in direct contravention to that interest. Federal Express told its customers two things: (1) do not ship cash, and (2) we may open and inspect your packages at our option. As a matter of law, this simply eliminates any expectation of privacy. We affirm the district court's finding that Young did not have any legitimate expectation of privacy in the packages x-rayed

---

[3]The Supreme Court in *Jacobsen* noted that Federal Express agents opened the packages at issue there "pursuant to a written company policy regarding insurance claims." *Id*. at 111. We surmise that Federal Express began including the notice now appearing on its airbill sometime after, and perhaps in response to, the *Jacobsen* decision. We are confident that had such a provision been present the Supreme Court would have considered and discussed it.

by the IRS agents.

B.

As an alternative basis for affirming the denial of the motion to suppress, we also find a consent to search through the bailment relationship. Just as the "right to inspect" notice defeated Young's privacy interest, we believe it also served to defeat Young's Fourth Amendment challenge because it authorized Federal Express, as a bailee of the packages, to consent to a search. *Frazier v. Cupp*, 394 U.S. 731 (1969).[4]

Courts have recognized that a third party has actual authority to consent to a search of a container if the owner of the container has expressly authorized the third party to give consent, or if the third party has mutual use of the container and joint access to or control over the container. *See, e.g., United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1992). We see no reason why this concept should not extend to packages shipped through private carriers when those carriers have explicitly warned those utilizing their services that their packages are subject to search. We find analogous the Fourth Circuit's decision in *United States v. Clarke*,

---

[4]In *Cupp*, defendant challenged the trial judge's decision to allow clothing seized from his duffle bag to be introduced into evidence. *Id*. at 740. The duffle bag was used jointly by defendant and his cousin, Rawls, and it had been left in Rawl's home. *Id*. When Rawls was being arrested he consented to a search of the bag, and it was during this search that the officer found the clothing that was subsequently received in evidence. *Id*. Affirming the trial court's decision to receive the evidence, the Court found that defendant assumed the risk that Rawls might consent to a search. *Id*.

where the court affirmed the district court's denial of defendant's motion to suppress drugs found by officers in a toolbox. *United States v. Clarke*, 2 F.3d 81, 85 (4th Cir. 1993). Defendant in *Clarke* contended that a car search by a state trooper violated his rights under the Fourth Amendment. Defendant had hired a third party – a fellow named Latimer – to transport a toolbox packed with narcotics to his brother. During the trip, Latimer was stopped by a trooper and consented to a search of the car and, significantly, the toolbox. Distinguishing the car search from the search of the container, the court held:

> [W]hen Clarke hired Latimer to transport the toolbox to his brother, he took the risk that Latimer would consent to a search of the car and the toolbox. We need not address whether the loan of an automobile to another person invests that individual with authority to consent to the search of every item in the car. Where the very purpose of retaining Latimer was to transport drugs in a container, Latimer plainly possessed authority to consent to a search of that container.

*Id.*

The evidence here is even more compelling. It is not necessary for us to draw inferences from the evidence, like the Fourth Circuit was forced to do in *Clarke*, as to whether Federal Express possessed authority to consent to a search of the packages. When Young and his co-defendants chose to utilize Federal Express they were unequivocally on notice, as evidenced by the plain language of the

14

airbill, that this private carrier retained the right to inspect their packages. Certainly one with full possession and control along with the right to inspect has the authority to consent to a search by law enforcement officials. Defendants were also warned not to send cash. Being fully aware that the carrier might conduct, or consent to, a search of packages containing expressly prohibited material, defendants nevertheless chose to ship large amounts of cash with Federal Express. Young assumed the risk that Federal Express might consent to a search. When Federal Express did consent, Young's Fourth Amendment rights were not offended.[5]

## IV.

For the reasons set forth above, the judgment of the district court is AFFIRMED.

---

[5]Young raises seven other issues on appeal: a) that the district court abused its discretion in limiting Young's good faith defense to the conspiracy count and by refusing to permit Young to present evidence on "public authority" and "entrapment by estoppel"; b) that the district court erred by refusing to suppress evidence that Agent Sutherland acquired during his two-year review of DTM's 637 certificate; c) that the district court erred by failing to strike testimony regarding a prior bad act and abused its discretion by refusing to grant a mistrial or issue a curative instruction; d) that the district court plainly erred in permitting the United States to amend the indictment mid-trial to change factual allegations concerning the amount of gallons of diesel fuel sold and taxes owed; e) that the district court erred in imposing an upward adjustment to Young's sentence for obstruction of justice for Young's failure to appear at sentencing; f) that the district court erred in calculating tax loss at sentencing; and g) that the district court erred in imposing an upward adjustment for sophisticated means at sentencing. We find no merit in any of these challenges, nor do we believe they warrant discussion. We affirm the district court in each instance. *See* 11TH CIR. R. 36-1.