UNITED STATES of America, Plaintiff,

v.

Jose Joaquin GRAVIER and Mariano Bustamante-Cuadros, Defendants.

No. CR–1–81–94.

United States District Court,
S. D. Ohio, W. D.

Feb. 24, 1982.

James Cissell, U. S. Atty., Anthony Nyktas, Asst. U. S. Atty., Cincinnati, Ohio, for U. S.

Henry E. Sheldon, Ralph P. Ginocchio, Cincinnati, Ohio, Sam Weiner, Columbus,

Ohio, Jorge L. Carro, Cincinnati, Ohio, for defendants.

## OPINION AND ORDER DENYING MOTION TO SUPPRESS

SPIEGEL, District Judge:

Defendants filed a joint motion to suppress evidence seized from Room 535 of the Westin Hotel on October 14, 1981 (doc. 20, CR–1–81–94). On that date, defendants were occupying Room 535. During the evening of October 14, defendant Gravier was arrested by federal agents in the Westin's piano bar just prior to defendant Bustamante-Cuadros' (Bustamante) arrest in Room 535. Following Bustamante's arrest, federal agents seized three plastic bags from Room 535, each of which contained approximately one kilo of cocaine. The agents had neither arrest nor search warrants. Defendants filed their motion on the basis that the search and seizures were unreasonable and violated the Fourth Amendment to the United States Constitution. The Government filed a motion in response (doc. 22), in which it argued that the search and seizures were proper either as incident to a lawful arrest or as within the scope of the plain view doctrine.

The matter came on for hearing on January 12, 1982. It was continued until January 19, 1982, so that the Court, with counsel present, could examine the objects seized which were unavailable at the time of the January 12 hearing. Subsequent to this examination, the Court permitted counsel to file supplemental memoranda. Defendants Gravier and Bustamante each filed memoranda in support of the motion (doc. 32 of CR–1–81–94–1 and doc. 11 of CR–1–81–94–2, respectively), to which the Government responded (doc. 33).

Although much of the testimony relating to defendants' motion to suppress had been adduced at a preliminary hearing conducted on October 22, 1981 before the United States Magistrate, J. Vincent Aug, Jr., which transcript the Court has examined, the Court is basing its decision primarily on the testimony and exhibits and review of the evidence considered at the hearings on the motion to suppress on January 12, 1982 and January 19, 1982. The Court, after consideration of the testimony and exhibits presented at these hearings, and the memoranda and legal arguments presented by counsel, has concluded that defendants' motion to suppress, although admirably presented and extremely well briefed, should be denied.

The evidence disclosed that Mr. William Modesitt, a Drug Enforcement Administration Agent working in an undercover capacity, met with defendant Gravier and Carlos Castaneda, a co-defendant in these proceedings, in Miami, Florida. At the meeting, Agent Modesitt negotiated a purchase price for cocaine with Gravier and Castaneda and obtained a sample of the quality of the cocaine they had to sell to him. This sample later proved to be 95% pure.

Agent Modesitt returned to Cincinnati and continued his contacts with Castaneda and Gravier by telephone. After numerous telephone calls, the men arranged that three kilos of cocaine would be delivered and sold to Agent Modesitt in Cincinnati. Gravier drove from Florida with defendant Bustamante, arriving in Cincinnati on October 14, 1981. Modesitt met them in the parking lot of the Victoria Station Restaurant on West Eighth Street. The three men agreed they would go to the Westin Hotel to consummate the sale of the cocaine for the prearranged price of $186,000.

Gravier and Bustamante checked into the Westin Hotel and were given Room 535. Bustamante went up to the room first, and Gravier invited Agent Modesitt to follow him up to see the cocaine. In Room 535, Agent Modesitt observed three, opaque plastic bags which had been removed from a yellow flight bag that Bustamante had been carrying. A clear, zip-lock plastic bag was removed from each of the opaque bags. Inside of the zip-lock bags, Agent Modesitt could see a white, powdery substance which resembled cocaine.

Bustamante put the clear bags back into the opaque bags and then back into the yellow flight bag. Gravier told Agent Mo-

desitt that Bustamante did not speak English, so Agent Modesitt spoke mainly to Gravier. Bustamante and Gravier had a conversation in Spanish, after which Gravier told Modesitt that Bustamante wanted to conduct the transaction in a different fashion. Apparently, Gravier was to go with Agent Modesitt to the piano bar where another agent was holding the money. Gravier would count the money there. Once the money was counted, Modesitt was to return to Room 535 alone and get Bustamante. All of the men would then meet in the lobby, where arrangements to exchange the drugs and money would be completed.

Bustamante, according to plan, remained in Room 535 while Gravier and Modesitt went to the piano bar. When Gravier sat down in the bar he was arrested by DEA agents there. The agents found a loaded .38 caliber revolver tucked in his waistband and drug related paraphernalia on his person. Agent Modesitt left Gravier in the company of some agents and returned to Room 535 accompanied by five other agents, including Agent Lionel Stewart. On the way up to the room, Agent Modesitt told Agent Stewart that he had seen the cocaine in Room 535 in separate, plastic bags. By the time Agent Modesitt returned to Room 535, approximately five to ten minutes had elapsed since he had left it.

Outside the room, all of the agents but Agent Modesitt put their badges on their outside pockets and positioned themselves out-of-view of the door's peephole. Agent Modesitt knocked on the door, and Bustamante opened it for him. The other five agents then burst into the room with their guns drawn and told Bustamante that they were federal narcotics officers and that he was under arrest. Bustamante turned and ran back into the room in the direction of a table on which a loaded, nine-millimeter automatic pistol was lying. Two of the agents caught him, placed him on the bed, and wrestled with him briefly before they were able to handcuff him. Two other agents checked the bathrooms for possible accomplices.

Agent Modesitt, who had followed the other agents into the room, walked over to the yellow flight bag which was partially unzipped. He looked in and discovered that the bags of cocaine had been replaced by an ice bucket stuffed with clothing. Agent Modesitt announced that the cocaine was no longer there. Agent Stewart, who was standing next to a chest of drawers and within a few feet of Agent Modesitt, glanced down and saw what he thought were the plastic bags inside the top drawer which was partially open about an inch-and-a-half. Stewart asked Modesitt if that was what he was looking for. Agent Modesitt came over to the front of the chest of drawers, looked in, and recognized one of the opaque, white plastic bags he had seen earlier while in the company of Gravier and Bustamante. He then opened the drawer and extracted the three bags containing the white powder which he had been shown earlier. The entire sequence of events from the time that the agents entered the room until the white powder was discovered, according to one of the Government agents, took less than five minutes.

At the hearing on January 12, 1982, Agent Stewart's testimony was as follows:

By Mr. Nyktas:

Q: Do you recall when you looked inside what you saw?

A: What I saw appeared to be a plastic bag with a reddish end. I at this time asked Mr. Modesitt if this was similar to the plastic bags he was shown.

The Court: Right there, before you talked to Modesitt, when you looked in, you couldn't see any powdery substance?

Witness: No, I couldn't.

The Court: My impression of your testimony before, when you looked down, you saw some clear plastic bags with a powdery substance.

Witness: I saw a plastic bag in the bottom of the drawer which appeared to have some red writing or coloring to it. I, at this time, asked Mr. Modesitt if that was similar to the bag he was talking about. At this time, he looked

in the drawer, said "Yes," and pulled it open. After pulling it open, the white powder was there.

Redirect Examination by Mr. Weiner:

Q: Mr. Stewart, you say after the drawer was pulled open the bags were taken out, then Agent Modesitt reached inside the bag and pulled out the glassine envelopes containing the—

A: Correct.

Q: Okay. So they were contained within a container?

A: As far as I remember, yes.

Q: Okay.

A: The only bag I can recall seeing is the plastic bag with some red to it and asked him if that was similar to the bags he had seen.

Q: And that is all you saw?

A: That's correct.

Q: (Cont'd)—what appeared to be red plastic?

A: That is correct.

Q: Okay (Tr. 99).

An eyeglass containing a white substance in rock form located next to the flight bag was also seized, along with the gun lying on the table.

It is obvious to the Court that the entry to Room 535 by the federal agents, chasing Bustamante across the room, and subduing him before he could get to the loaded pistol, checking the premises for accomplices, looking for the cocaine in the shoulder bag, and seeing the partially opened drawer, all took place in a very short period of time. Agent Modesitt had seen the three packages of cocaine in glassine zip-lock bags, each in separate store bag, so he knew what he was looking for. The testimony is not clear as to whether Agent Stewart had been told precisely how the cocaine was packaged, nor is the evidence clear as to precisely what Agent Stewart saw in the partially opened drawer. The Court is satisfied, however, that Agent Stewart saw a plastic container with red writing or coloring on it, which he called to the attention of Agent Modesitt, who recognized it as obviously being a container of one of the kilos of cocaine. On January 19, 1982, the Government produced the contraband and the containers for examination by the Court in Chambers.

Agent Stewart demonstrated how far the drawer was opened, after he had placed the clear bags containing cocaine in their respective store bags in a drawer of the conference table in Chambers, which demonstrated that one could see a portion of the plastic store bag from the partially opened drawer. Agent Stewart's testimony is as follows: (Tr. 8, January 19, 1982)

The Court: ... Now, Mr. Stewart, if you wouldn't mind, could you put them in the drawer the way you saw them? The drawer might not be deep enough. (Agent Stewart placing the bags in the conference table drawer.)

Mr. Stewart: No, because the exact location of the other two bags, I can't be certain which way they were sitting in the drawer. But when I saw the drawer, the drawer was similar to that (indicating), and I was standing actually in the hotel room. I would have been facing this (indicating) way in the direction of the bed, and when I looked, at about where you are standing, is where I saw the bag, the yellow bag.

The Court: The shoulder bag:

Mr. Stewart: The shoulder bag. As I was standing.

The Court: Indicating about three feet to Agent Stewart's left.

Mr. Stewart: There was a TV station (sic) on top of the table. As I looked down, I saw what I see right here: a reddish bag. I called Agent Modesitt. I said, "does that look like the bag?" He said "Yes." At this time, I pulled the drawer open.

The Court: And the other two?

Mr. Stewart: Were in the drawer, the exact location I didn't see.

The scope of a warrantless search incident to a lawful arrest was defined in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685.

[I]t is reasonable for the arresting officer to search the person arrested in order to

remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from which he might gain possession of a weapon or destructible evidence.

*Chimel v. California*, 395 U.S. at 763, 89 S.Ct. at 2040.

■ In this Court's opinion, a search of the room in which defendant was arrested would have been reasonable and lawful under *Chimel*. The agents clearly had probable cause to arrest Bustamante. They also had reasonable cause, in light of the weapon taken from Gravier and the automatic pistol lying on the table in the room, to search for weapons within the area of Bustamante's control. The agents also knew that there was evidence within this area, the cocaine, which Agent Modesitt believed to be in the yellow flight bag. And, the events which transpired were certainly contemporaneous with, if not simultaneous to Bustamante's arrest. The agents had no time to acquire a warrant. Thus, the agents were where they had a lawful right to be with probable cause to search the room in which Bustamante was arrested. *Watkins v. United States*, 564 F.2d 201 (6th Cir. 1977), *cert. denied*, 435 U.S. 976, 98 S.Ct. 1626, 56 L.Ed.2d 71 (1978) (search of the area under a mattress in a room where defendant was taken to get a shirt held lawful); *United States v. Weaklem*, 517 F.2d 70 (9th Cir. 1975) (search of a cabinet two-to-four feet from where a co-defendant was lying on the floor held lawful); *United States v. Artieri*, 491 F.2d 440 (2d Cir.), *cert. denied*, 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118 (1974) (search of a table in front of defendants at the time they were arrested held lawful); and *United States v. Savage*, 564 F.2d 728 (5th Cir. 1974) (search of a motel room in which defendant was arrested held lawful).

■ However, no search of the premises, other than for accomplices, occurred. Instead, when Agent Modesitt discovered that the cocaine was no longer in the flight bag, Agent Stewart glanced down and inadvertently saw what he believed Agent Modesitt had previously described to him as the bags containing the cocaine. He called Agent Modesitt over to look and Agent Modesitt verified the fact that what Agent Stewart had seen was indeed the packaged cocaine. Although these events did not technically constitute a "search," the agents could have conducted a search within the area of Bustamante's immediate control incident to his arrest, the fruits of which would have been admissible. Such a search would have been eminently reasonable. The Court does not find that the inadvertent discovery of the cocaine under these circumstances was violative of the Fourth Amendment's prohibition against unreasonable searches and seizures. *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Shipley v. California*, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969); *Von Cleef v. New Jersey*, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969).

■ However, the Court notes that the discovery of the cocaine by Agent Stewart also falls within the scope of the "plain view" exception to warrant requirements. If a law officer has a right to be where he is, and inadvertently comes upon immediately recognizable, incriminating evidence, he may lawfully seize it. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Harris v. United States*,

390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968). Inadvertent does not mean unexpected. An "inadvertent" discovery occurs when an officer does not have probable cause to believe that he will find a specific item at a particular place until he actually sees it. *United States v. Hare*, 589 F.2d 1291 (6th Cir. 1979). *See also United States v. Bolts*, 558 F.2d 316 (5th Cir.), *cert. denied*, 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 246 (1978).

■ The agents were lawfully in Bustamante's hotel room effecting a valid arrest. Further, they had a right to be there as conducting a search incident to a lawful arrest for weapons or evidence within the arrestee's control. Although the agents believed the cocaine to be in the room, they believed it to be in the yellow flight bag. Thus, Agent Stewart's discovery of the cocaine was inadvertent under *United States v. Hare, supra*. When he glanced down into the slightly open drawer, Agent Stewart immediately recognized what he thought was the packaged contraband which Agent Modesitt had described to him earlier. Since the agents knew the cocaine was contained in bags and did not have to search the bags to discover their contents, the Court finds this fact situation is not controlled by *Robbins v. United States*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981). Agent Modesitt discovered the contents of the packages when he was lawfully in Room 535 in his earlier meeting with Gravier and Bustamante and conveyed this information to Agent Stewart. Thus, even though the cocaine was concealed in opaque bags, the Court finds that it was immediately recognizable as evidence and thus in plain view. *See United States v. Ortiz*, 603 F.2d 76 (9th Cir. 1979); *United States v. Johnson*, 561 F.2d 832 (D.C.Cir.1977), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1978); *United States v. Welsh*, 446 F.2d 220 (10th Cir. 1971). Likewise, since the agents had probable cause to believe that the white powder contained in the bags was cocaine, the fact that the substance was not conclusively proven to be cocaine until subjected to laboratory tests did not make the incriminating nature of the packages less obvious. *United States v. Rodriguez*, 596 F.2d 169, 175 (6th Cir. 1979).

Therefore, this Court finds that the cocaine which was found by the agents in Room 535 is admissible in evidence, its discovery falling within either the scope of a search incident to a lawful arrest or the scope of the plain view exception to the warrant requirement. *Chimel v. California, supra; Coolidge v. New Hampshire, supra*. Accordingly, defendants' motion to suppress the evidence seized is without merit and is denied.

SO ORDERED.