UNITED STATES of America, Plaintiff-Appellee,

v.

Jose Joaquin GRAVIER and Mariano Bustamante-Cuadros, Defendants-Appellants.

Nos. 82–3369, 82–3429.

United States Court of Appeals, Sixth Circuit.

Argued March 29, 1983.

Decided May 9, 1983.

David J. Graeff (argued), Columbus, Ohio, for defendant-appellant in No. 82–3429.

Henry E. Sheldon, II (argued), Cincinnati, Ohio, for defendants-appellants in No. 82–3369.

Anthony Nyktas (argued), Asst. U.S. Atty., Cincinnati, Ohio, for plaintiff-appellee in both cases.

Before MERRITT, KENNEDY and WELLFORD, Circuit Judges.

PER CURIAM.

Appellants were convicted of drug conspiracy and possession of cocaine with intent to distribute charges, and appeal their convictions following a suppression hearing and a jury trial. The suppression hearing dealt with appellant Bustamante's motion to suppress three bags of cocaine found in the hotel room which he was occupying and from which the other appellant, Gravier, had just departed after the bags containing the cocaine had been displayed in his presence to an undercover agent seeking to purchase the substantial quantity of cocaine involved. Both appellants contest the admissibility of taped conversations between the undercover agent, William Modesitt of the Drug Enforcement Administration (DEA), and a third party, one Castaneda, who pled guilty to the related charges made against him as a member of the alleged conspiracy. Appellants contend that their actions in bringing cocaine to Cincinnati involved a different conspiracy from that in which Castaneda may have been involved.

Modesitt, posing undercover as a drug dealer from Cincinnati, Ohio, met with Gravier and Castaneda in Miami, Florida, during September of 1981 to discuss purchasing cocaine from them on a regular basis for resale in the Cincinnati area. Modesitt negotiated a purchase price for the cocaine and obtained a sample. Modesitt returned to Cincinnati and stayed in contact with Gravier and Castaneda by telephone.

On October 10, 1981, Modesitt spoke with Castaneda by telephone and ordered three kilos of cocaine. Castaneda indicated that

he would let him know about the delivery. The next day, Castaneda called Modesitt and told him that Gravier was going to talk to some other people and get back to Castaneda. He indicated that likely he and Gravier would be delivering the cocaine to Cincinnati. Modesitt spoke with Castaneda again on October 12. Castaneda told Modesitt that Gravier would deliver the cocaine the following Wednesday, and that the people who supplied the cocaine would be coming with him. Castaneda then asked Modesitt to reserve two motel rooms in Cincinnati.

Still later on October 12, Modesitt received a telephone call from Gravier, who told Modesitt that he and Castaneda had a disagreement and that Castaneda was no longer included in the transaction. He stated, however, that the three kilos of cocaine would be forthcoming and that he had made the necessary arrangements with others about delivery.

The next day, Castaneda again called Modesitt, and advised him that Gravier had told him that Gravier's "people" did not want to meet him, that they did not want anyone but Gravier now included. Later that same day, Modesitt received a call from Gravier to the effect that the other party and he would now rent a car to deliver the cocaine to Cincinnati. On October 14, Gravier called Modesitt and told him that he and "another guy" were in Jellico, Tennessee, en route to Cincinnati.

Modesitt met Gravier and Bustamante, at a restaurant in Cincinnati in accordance with their arrangements. This was Modesitt's first contact with Bustamante, who spoke little, if any, English. The three men proceeded to the Westin Hotel to consummate the sale of the cocaine.

It was late at night when Gravier and Bustamante checked in; Bustamante went to the room first, then Gravier invited Modesitt to come to the room to see the cocaine. Once in the room, Modesitt was shown three opaque, but not transparent, plastic bags taken from a yellow flight container that Bustamante had been carrying. A clear plastic bag containing a white powdery substance was removed from each bag. Bustamante then put the clear plastic bags containing what was indicated to be cocaine back into the other bags, and returned them to the yellow flight container.

Gravier told Modesitt that Bustamante wanted Gravier and Modesitt to go to get the money for the cocaine buy. Once the availability of money was ascertained, Modesitt was to return to the room to get Bustamante. All would then meet in the lobby, where the cocaine and money would be exchanged. Gravier and Modesitt went to the bar of the Westin, where Gravier was arrested by DEA agents. Modesitt then left Gravier with other agents and went to the room with five other agents to arrest Bustamante. When Bustamante opened the door for Modesitt, the agents burst into the room with guns drawn and told Bustamante that they were federal officers and he was under arrest. Bustamante ran back into the room in the direction of a table upon which a pistol was lying. Two of the agents caught Bustamante, put him on the bed and handcuffed him. Two other agents checked the bathroom for possible accomplices. Modesitt then walked over to the partially unzipped yellow flight container and looked inside. He discovered that the bags of cocaine were not there, and so advised the other agents present.

Agent Stewart, who was standing next to a chest of drawers and within a few feet of Modesitt, then glanced down into the top drawer which was open about an inch, and a half. Inside he saw what he thought were the plastic bags which had been described by Modesitt, who came over to the chest and looked into the partially opened drawer. He recognized therein the same opaque plastic bags he had seen earlier while with Gravier and Bustamante. The agents opened the drawer and seized the three bags containing cocaine. Also seized from the room were an eyeglass case containing cocaine and a handgun, which were in view.

Bustamante was unsuccessful in his challenge to the admission into evidence of the cocaine seized without a search warrant as

were both appellants in their efforts to suppress the tapes of conversations between Modesitt and Castaneda.

■ We affirm the district court, 532 F.Supp. 876, in its decision not to suppress this evidence of the cocaine and of the telephone calls. The district court found that the discovery of the cocaine by Agent Stewart fell within the scope of the plain view exception to the warrant requirement, noting that the DEA agents were lawfully in the hotel room effecting a valid arrest. In addition, the court found that the agents had a right to conduct a search incident to the arrest of Bustamante for weapons or evidence. When Stewart glanced down into the partially open drawer, he recognized the packages described to him by Modesitt. The court found that, since the agents knew the cocaine was contained in opaque bags, it was immediately recognizable as evidence even though the nature of the contents could not specifically be seen by Stewart without opening those bags.

■ The "plain view" exception to the warrant requirement is applied where a police officer has a prior justification for an intrusion in the course of which he comes inadvertently across a piece of incriminating evidence. *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971); *United States v. Rodriguez,* 596 F.2d 169, 175 (6th Cir.1979). The district court found that the inadvertence requirement was met under this Court's decision in *United States v. Hare,* 589 F.2d 1291 (6th Cir.1979).

Agent Stewart's discovery of the bags when he glanced into the partially opened drawer justified seizure under the circumstances. Since the bags of cocaine were shown to Agent Modesitt in the hotel room a short time before, even if out of immediate sight when he and the agents returned to the room, there was a proper basis for the agents to look about for any unconcealed articles in a cursory overview of the immediate area.

This holding finds support in *United States v. Rodriguez, supra.* In that case an airline employee conducted a private party search of a package and found that it contained drugs. The employee called the police. The police came and saw the contents of the partially opened box, which appeared to be contraband. The court found that the plain view exception applied because (1) the officer was lawfully present, (2) the object was in plain view, and (3) its incriminating nature was immediately apparent. The court found the third requirement met where the contents looked like narcotics packaged in plastic bags, ready for sale. (596 F.2d at 175). Similarly, in this case, Agent Stewart was lawfully in the hotel room to arrest Bustamante, the bags were visible in the partially opened drawer, and their incriminating nature was apparent, particularly in light of Modesitt's description of them. Agent Modesitt lawfully saw the bags of cocaine when he was in the motel room with Gravier and Bustamante, and the three requirements set out in *Rodriguez, supra,* were met at that time. Therefore, the subsequent look in the same motel room, occurring a few moments later, for the same bags of contraband would fall under the plain view exception.

Appellants also argue that the evidence shows that there were actually two conspiracies; the first between Gravier and Castaneda; and the second between Gravier and Bustamante. They point to the fact that after Gravier and Castaneda had their disagreement, each offered separately to supply Modesitt with the cocaine he had ordered. Appellants note, moreover, that Bustamante was never mentioned by name, nor did Modesitt meet him until after Castaneda was removed from the planned delivery. The government, on the other hand, argues that the evidence indicates that there was one continuing conspiracy in which Gravier, Bustamante and Castaneda each participated. It contends that there is sufficient evidence to show that Bustamante was involved before the conspiracy between Gravier and Castaneda ended.

■ It has long been established that a conspirator may join a conspiracy already in progress and be held responsible for actions

done in furtherance of the conspiracy before he joined. *See Poliafico v. United States,* 237 F.2d 97 (6th Cir.1956), *cert. denied,* 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597. Particularly in a "chain" conspiracy, such as the one alleged in the instant case, a single conspiracy does not become multiple conspiracies simply because each conspirator did not know every other conspirator, or because each conspirator was not involved in every aspect of the conspiracy. *United States v. Warner,* 690 F.2d 545, 548–49 (6th Cir.1982).

In the case at bar, there was sufficient evidence that Bustamante was involved in the conspiracy before Castaneda was excluded from it to admit the evidence of conversations with Castaneda. On October 11, Castaneda told Modesitt that Gravier was supposed to talk to another person, and call back Castaneda. On October 12, Castaneda told Modesitt that Gravier was coming to Cincinnati to deliver the cocaine, and that the persons who supplied the cocaine would be coming with him; consequently, Modesitt was to get two motel reservations. Later on the 12th, Gravier called Modesitt and told him about the disagreement with Castaneda. Gravier had stated to Castaneda that the people who supplied the cocaine had accepted responsibility for delivering it. On the 13th, Castaneda told Modesitt that Gravier had told him that he could not accompany them in the delivery of the cocaine because Gravier's people did not want to meet Castaneda. Eventually, the other person involved turned out to be Bustamante. There was ample evidence, then, for a jury to find that Bustamante was involved before Castaneda was excluded from the conspiracy, even though he was not mentioned by name.

Accordingly, the district court was correct in allowing the taped conversations with the co-conspirator to be admitted.

The convictions are accordingly affirmed as to both appellants.