791 F.2d 936
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
BURNS STEPHEN STANLEY, Defendant-Appellant.
 84-1649
 United States Court of Appeals, Sixth Circuit.
 4/2/86
 
 AFFIRMED
 E.D.Mich.
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DIVISION OF MICHIGAN
 Before: LIVELY, Chief Judge, MERRITT and WELLFORD, Circuit Judges.
 WELLFORD, Circuit Judge.
 
 
 1
 Appellant, Burns Stephen Stanley, appeals his conviction of conspiracy to distribute and to possess cocaine with intent to distribute (21 U.S.C. Sec. 846). Following a jury trial, Stanley was sentenced to five years imprisonment.
 
 
 2
 Stanley was charged in one count of a nine count indictment with conspiracy to possess and distribute cocaine. In that count, the government alleged that between 1972 and 1982 Stanley and five other named defendants had conspired to possess with intent to distribute and had distributed cocaine. The indictment indicated that codefendant James Tanceusz was the primary distributor who coordinated payment for and the shipment of cocaine from Florida to Michigan. Codefendant Paul Toscano was named as a supplier to Tanceusz. Codefendants Richard Shrope, Timothy Seaver, Philip Vern Naylor, and Stanley were named as further or subsequent distributors of cocaine obtained from or through the efforts of Tanceusz. All defendants except Stanley pled guilty before trial and two of them testified for the government at Stanley's trial. The scope of the alleged conspiracy was delineated through testimony at trial from former employees and customers of the various codefendants.
 
 
 3
 In 1972, Tanceusz and Stanley were involved in cocaine distribution to dealer Mark Nowicki. Nowicki testified that Stanley sold cocaine from his residence and had various drug paraphernalia and cocaine processing equipment there. During the intervening years, Tanceusz discovered Nowicki's drug sources and began to deal directly with them. During 1980 or 1981, Nowicki tried to obtain cocaine from Tanceusz who allegedly stated that he also supplied Stanley with cocaine.
 
 
 4
 In 1978, Stanley recruited David Jones as an associate in cocaine distribution. As their business relationship grew, Jones became a salesman for Stanley's cocaine. In the summer 1979, Jones received a request for four ounces of cocaine and tried to fill the order through Stanley. Stanley stated that he was out of cocaine, but would obtain some from Tanceusz, who he stated, had higher quality, more expensive, cocaine. After Stanley allegedly obtained the cocaine from Tanceusz, he told Jones that he ordinarily did not deal through him because of price, but that he would deal with him occasionally when he was out of cocaine or when an order was large enough to justify the higher price. Jones also testified that he had met Tanceusz in Stanley's presence on numerous occasions during the three years he was associated with Stanley. Jones also had indirect contact with Tanceusz by mailing several thousand dollars to Tanceusz's girlfriend in Florida at Stanley's direction. Stanley later told Jones that the money had safely arrived in Florida.
 
 
 5
 In 1980, codefendant Seaver became involved in Tanceusz's cocaine distribution business in exchange for forgiveness of a large debt. Seaver's role was to store the cocaine and repackage it for sale. Tanceusz would then pick up the packages, but occasionally requested Seaver or his assistants to deliver the repackaged cocaine to a specified party, who on two occasions turned out to be Stanley.
 
 
 6
 In May 1982, the government intercepted a number of telephone conversations at Tanceusz's home pursuant to a court order which had extended an April 1982 wiretap order. Several of the intercepted conversations were played for the jury at trial. In a series of conversations early in May, Tanceusz made arrangements with alleged coconspirators, Toscano and Mark, that the latter travel from Florida to Detroit to meet with Tanceusz. In guarded language, Tanceusz told Toscano and Mark that he was expecting to get some money shortly and for that reason was not worried about 'paying [his] bills.' Tanceusz said he did not want to come to Florida because he was concerned about surveillance by law enforcement agencies.
 
 
 7
 In one of their conversations, Toscano pressed Tanceusz to try to get him some 'paperwork,' and Tanceusz said that he would. In a later conversation with Mark, Tanceusz said that he was going to get some money from Stanley, which he would give to Mark to pay the 'people I owe.' Several days later, Tanceusz spoke with Stanley and asked him 'when am I gonna get it.' Stanley replied that he would need more time.
 
 
 8
 Later that month, Stanley told Tanceusz over the telephone that he had a 'nice little thing' for Tanceusz which at trial he admitted to be a check for $15,000. Shortly after that telephone conversation, Stanley met with Tanceusz and delivered to him a $15,000 check payable to Stanley and endorsed to Tanceusz, who used it as collateral on other drug deals.
 
 
 9
 Tanceusz then obtained a substantial supply of cocaine and asked codefendant Shrope if Shrope wanted to buy some of it. Shrope agreed to buy eight ounces for $16,000 that Shrope had obtained from another codefendant. On June 2, 1982, Ann Arbor police officers conducted a warrant-authorized search of Tanceusz's home. The search yielded various narcotics paraphernalia and nearly two pounds of cocaine.
 
 
 10
 At his trial, Stanley testified on his own behalf and called one other witness. Stanley admitted that he sold cocaine, that he was a good friend of Tanceusz, and that he regularly used heroin and cocaine during the 1970's. He denied, however, that he had ever sold cocaine obtained from Tanceusz. He said that at one point he had asked Tanceusz to sell him cocaine and let him into Tanceusz's cocaine business, but Tanceusz allegedly refused to do so because, according to Stanley, Tanceusz 'cared about me' and did not want Stanley to become involved in his cocaine business. When asked on cross-examination about his sources for cocaine, Stanley testified that he obtained it 'from some black people I knew in Detroit,' but did not specify further.
 
 I. Validity of Search Warrant
 
 11
 Stanley first assigns as error denial of his motion to suppress evidence obtained during a search of defendant Stanley's residence pursuant to a warrant. Defendant claims that the warrant was obtained through intentionally or recklessly false statements in a police affidavit, contending that Franks v. Delaware, 438 U.S. 154 (1978), required suppression of the evidence. The magistrate recommended denying defendant's motion, and the district judge followed this recommendation.
 
 
 12
 The affidavit submitted by Detective Flynn for the search warrant provided:
 
 
 13
 Your affiant is in charge of an on-going surveillance of the above-described [Stanley] premises for approximately three months. During said surveillance suspected drug trafficking has been observed in the nature of numerous persons, some known to be trafficers [sic], coming and going from the above-described residence bringing in parcels while leaving without and entering parcels leaving with. On February 1, 1979 at approximately 10:15, your affiant was conducting surveillance on the above-described residence when one Lewis Andrews was observed entering the residence empty-handed and left carrying a large bag and drove away at approximately 11:30. Officers of the Ann Arbor Police Department stopped said vehicle and Detective Richard Anderson observed a large bag next to Mr. Andrews in plain view in the vehicle. The top of said bag was open and suspected marihuana was observed therein in plain view. Your affiant believes that the above-described residence may still contain marihuana and other controlled substances and trafficing [sic] paraphenalia [sic].
 
 
 14
 A search of Stanley's house produced drugs and other drug-related paraphernalia.
 
 Franks provides:
 
 15
 [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.
 
 
 16
 438 U.S. at 155-56. In this case, the magistrate determined that defendant had satisfied the first prong of Franks by making a sufficient showing to require an evidentiary hearing. After that hearing, the magistrate concluded that defendant failed to meet the remaining aspect of the Franks test and was unable to establish that the substance of the affidavit had been intentionally false. At best, he concluded that defendant could only show 'police negligence, and even over-zealousness and error on the law . . . they have not shown the level of deception or reckless disregard for the truth that Franks requires to excise portions of the Flynn affidavit.' The detective's statement implied that he was present during the surveillance when in fact he was not present, but rather supervising it. The magistrate stated that this inaccuracy was a product of negligence, but even if it were false, excision would not affect the validity of the warrant because 'a common sense reading of the affdiavit of the officer in charge would allow inference that the basis of knowledge about an ongoing police surveillance was either the officer's personal knowledge or hearsay from other police officers who are presumed to be reliable informants.'
 
 
 17
 Although the wording in the affidavit concerning Detective Flynn's role in the surveillance was inaccurate, the magistrate's finding, approved by the district court, that the mistake was not intentional or reckless, was not clearly erroneous. We find no reversible error with respect to Stanley's contention. See, e.g., United States v. Williams, 737 F.2d 594, 602 (7th Cir. 1984), cert. denied, 105 S. Ct. 1354 (1985).
 
 
 18
 Appellant also argues that affiant's failure to identify the actual source of the observations prevented the magistrate from properly determining whether probable cause existed. In support of this argument, defendant relies on United States v. Davis, 714 F.2d 896 (9th Cir. 1983) (holding a Franks violation and finding intentionally false a police officer's affidavit stating that he had personally interviewed the three informants upon whose information probable cause existed when in fact subordinates had interviewed these informants.) We find Davis distinguishable because the affiant there clearly demonstrated that he knew that he was misrepresenting the facts, but assumed the inaccuracy to be unimportant. As the Davis court noted in dicta, the affidavit would have been valid if the affiant had stated that he relied upon observations of other officers who had personally observed the facts as stated in the affidavit. Here, Detective Flynn implied that he was personally conducting the surveillance when in fact his role was only supervisory; he never stated that he had personally observed the activities giving rise to probable cause; but rather, relied on observations of Detective Anderson who was present at the scene. Such reliance upon a subordinate is sufficient to support an affidavit. Id. We would characterize Flynn's statements as containing 'some ambiguity as to its meaning, and inartful drafting, rather than any intent to deceive . . ..' United States v. Barone, 584 F.2d 118, 122 (6th Cir. 1978), cert. denied, 439 U.S. 1115 (1979). We find no Franks violation.[1]
 
 II. Validity of Wiretap
 
 19
 The government received authorization from a district judge to intercept wire communications from alleged coconspirator Tanceusz's phone and oral communications from his home. Subsequently, the government obtained a thirty-day extension of the original authorization. During the extension period, three conversations involving defendant Stanley were intercepted. Prior to trial, Stanley moved to suppress the intercepted conversations and any fruits thereof.[2] The district court denied that motion.
 
 
 20
 First, Stanley attacked the validity of the initial wiretap order. Second, Stanley contends that the government's application for an extension of the wiretap on Gregory Tanceusz's telephone was flawed in three respects: (1) the application failed to establish that other investigative techniques would be inadequate to obtain the desired evidence; (2) the extension application did not adequately apprise the district court of earlier wiretap applications, so that the district court could determine the need for further wiretapping; and (3) the extension application failed to include a detailed statement of the results obtained so far in the course of the electronic surveillance. The district court addressed and specifically rejected each of these claims prior to trial.
 
 
 21
 Having reviewed the record, we also reject appellant's contentions and find that the district court did not abuse its discretion in issuing the initial wiretap order or in granting an extension. See, e.g., United States v. Diggs, Nos. 83-1441/1537/1594/1617/1618, slip op. at 3 (6th Cir. April 19, 1985);United States v. Landmesser, 553 F.2d 17 (6th Cir.), cert. denied, 434 U.S. 855 (1977).
 
 
 22
 We find appellant's contention about the wiretapping meritless because the record indicates that the government set forth in its supporting affidavit an extensive list of the circumstances necessitating a wiretap. There was no abuse of discretion shown.
 
 
 23
 Defendant further contends that even if the initial application were appropriate, the extension application was not. However, since the factual justification for the order had not changed at the time extension was sought, 'it was unnecessary to vary the specific facts, admittedly accurate, in the renewal application.' United States v. Terry, 702 F.2d 299, 310 (2d Cir.), cert. denied sub nom., Williams v. United States, 461 U.S. 931 (1983). Appellant demonstrated no violation of 18 U.S.C. Sec. 2518(1)(c). His attacks on the validity and propriety of the wiretap orders do not warrant reversal.
 
 III. Sufficiency of the Evidence
 
 24
 Appellant contends that no conspiracy existed as charged because many of the named conspirators did not know him and he did not purchase all of his cocaine from Toscano. If there were a conspiracy, he argues that it was a multiple conspiracy and not the single one charged. Defendant further claims that the indictment erroneously alleged that a conspiracy existed continuously from 1972 to 1982 and that Toscano, the Florida cocaine supplier, had supplied the drug during that entire period. Finally, he claims that the indictment alleged that all the drugs involved in the conspiracy came from Florida. As to each of these contentions, Stanley asserts a failure of proof of the conspiracy charged against him.
 
 
 25
 Count 2 of the indictment sets forth the factual basis for defendant's participation in the drug conspiracy:
 
 
 26
 That beginning in approximately late 1972 and continuing until approximately June 1982, within the Eastern District of Michigan, and elsewhere JAMES GREGORY TANCEUSZ, RICHARD SHROPE, BURNS STEPHEN STANLEY, GLENN TIMOTHY SEAVER, PAUL TOSCANO, and PHILIP VERN NAYLOR all Defendants herein, did knowingly, intentionally and unlawfully combine, conspire, confederate and agree together and with other persons whose names are both known and unknown to the grand jury to commit an offense or offenses against the United States that is to possess with intent to distribute and to distribute various quantities of cocaine, a Schedule II Narcotic Drug Controlled Substance.
 
 
 27
 All in violation of Sections 841(a)(1) and 846 of Title 21, United States Code.
 
 
 28
 It was part of said unlawful conspiracy that JAMES GREGORY TANCEUSZ would travel to Florida and obtain quantities of cocaine for distribution in Michigan.
 
 
 29
 It was further part of said unlawful conspiracy that JAMES GREGORY TANCEUSZ would cause others to transport quantities of cocaine from Florida to Michigan.
 
 
 30
 It was further a part of said unlawful conspiracy that JAMES GREGORY TANCEUSZ would cause various people to transport currency to Florida.
 
 
 31
 It was further part of said unlawful conspiracy that PAUL TOSCANO would supply quantities of cocaine to JAMES GREGORY TANCEUSZ.
 
 
 32
 It was further part of said unlawful conspiracy that RICHARD JOSEPH SHROPE, BURNS STEPHEN STANLEY, GLENN TIMOTHY SEAVER and PHILIP VERN NAYLOR would obtain quantities of cocaine from JAMES GREGORY TANCEUSZ for redistribution.
 
 
 33
 The government charged that a single continuing conspiracy existed from 1972 until 1982, involving appellant and various others. The government theorized that the conspiracy charged was of the 'chain' type.
 
 
 34
 In one form of conspiracy, often described as a 'chain' conspiracy, the agreement can be inferred from the interdependent nature of the criminal enterprise . . .. Conspiracies to distribute narcotics, which normally involve numerous sales and resales of drugs until they reach the ultimate consumers, are often 'chain' conspiracies . . .. Because the success of participants on each level of distribution is dependent upon the existence of other levels of distribution, each member of the conspiracy must realize that he is participating in a joint enterprise, even if he does not know the identities of many of the participants.
 
 
 35
 United States v. Warner, 690 F.2d 545, 549 (6th Cir. 1982) (citations omitted).
 
 
 36
 If the evidence can be construed reasonably to support a finding of multiple conspiracies rather than a single continuing one, 'the resulting variance between the indictment and the proof is reversible error if the appellant can show that he was prejudiced thereby.' Warner, 690 F.2d at 548 (citing Kotteakos v. United States, 328 U.S. 750 (1946); Berger v. United States, 295 U.S. 78, 81-82 (1935); United States v. Sutherland, 656 F.2d 1181, 1195-96 (5th Cir. 1981), cert. denied, 455 U.S. 949 (1982)). Appellant contends that there was a variance and that he suffered the requisite prejudice.
 
 
 37
 Stanley claims that it was not until at least 1978 that he began distributing cocaine that he obtained from Tanceusz; that he did not deal regularly with Tanceusz at any time, and he did not deal with or know Tanceusz's retail distributors; and that Toscano was not shown to be a part of the conspiracy until 1982.
 
 
 38
 A defendant, however, may be guilty of conspiracy even if he does not know all the members of the conspiracy and even if he does not participate in the conspiracy throughout its duration. See, e.g., Blumenthal v. United States, 332 U.S. 539, 558 (1947); Warner, 690 F.2d at 550-51 & n. 7; United States v. Shermetaro, 625 F.2d 104, 108 (6th Cir. 1980). Furthermore, a single conspiracy is not converted into multiple conspiracies merely because there are changes among conspirators during the lifetime of the conspiracy. United States v. McLernon, 746 F.2d 1098, 1107 (6th Cir. 1984). Thus, 'a single conspiracy does not become 'multiple conspiracies' merely because 'each member did not know of or become involved in all of the activities in furtherance of the conspiracy." McLernon, 746 F.2d at 1108; United States v. Gravier, 706 F.2d 174, 178 (6th Cir.), cert. denied, 464 U.S. 996 (1983). A single conspiracy is established if the evidence shows that the conspirators agreed to participate in what they knew to be a collective venture directed toward a common goal. Warner, 690 F.2d at 549. The conspirators need only be aware of the 'essential nature of the plan and their connection with it.' Blumenthal, 332 U.S. at 557; United States v. Pickett, 746 F.2d 1129, 1134 (6th Cir. 1984), cert. denied, 105 S.Ct. 1222 (1985). Finally, the question whether the evidence establishes a single conspiracy or multiple conspiracies is a factual issue for the jury; if the evidence could plausibly support the finding that a single conspiracy was proved, a defendant's multiple conspiracy claim must fail. See Warner, 690 F.2d at 548; United States v. Grunsfeld, 558 F.2d 1231, 1238 (6th Cir.), cert. denied, 434 U.S. 872 (1977); United States v. Etheridge, 424 F.2d 951, 963-65 (6th Cir. 1970), cert. denied, 400 U.S. 993 (1971).
 
 
 39
 In applying these principles to the evidence adduced before the jury, we must view that evidence in a light most favorable to the government and uphold the conspiracy conviction if it is supported by substantial evidence. Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Chandler, 752 F.2d 1148 (6th Cir. 1985). We find the evidence sufficient to show that Stanley was a member of the conspiracy charged in the indictment. The evidence showed that Stanley engaged in repeated cocaine transactions with Tanceusz and others throughout the conspiratorial period. According to Nowicki's testimony, both Stanley and Tanceusz were selling cocaine in wholesale quantities as early as 1972. At a later date, Tanceusz told Nowicki that he was the person who supplied Stanley with cocaine, from which the jury could reasonably infer that their relationship had existed for several years. In 1979, the evidence showed, Stanley obtained cocaine from Tanceusz on an occasional basis--when his own supplier was unable to provide it to him, when he had a particularly large order, or when he needed a higher quality of cocaine than his regular supplier was able to provide. There was evidence of other contacts between Stanley and Tanceusz over the years in question when Stanley was dealing in drugs.
 
 
 40
 The evidence further showed that in 1981 and 1982, Tanceusz assigned an associate to deliver large quantities of cocaine to Stanley. Jones testified that during the three-year period that he worked as Stanley's drug salesman, he met Tanceusz in the presence of Stanley on numerous occasions. Finally, in the spring of 1982, there were dealings involving coconspirator Charles Mark, Stanley, and Tanceusz, and a substantial payment to Tanceusz for drugs by Stanley by reasonable inference.
 
 
 41
 There was evidence to show as early as 1978, Stanley and Tanceusz were part of a 'loose-knit, multi-person conspiracy' to distribute cocaine in the Eastern District of Michigan. See United States v. Alessi, 638 F.2d 466, 474 (2d Cir. 1980). Thus, even if Stanley did not work directly below Tanceusz in a hierarchical chain of command, the two men engaged in a continuing, long-term business relationship that the jury could properly have found to constitute part of a single cocaine distribution conspiracy.
 
 
 42
 The evidence does not support Stanley's claim that he was not involved with or aware of other members of Tanceusz's distribution network. Although not familiar with every member of the overall drug distribution operation, the evidence showed that Stanley knew enough about the other conspirators to have a clear idea of the scope of the enterprise with which he wilfully associated himself. Thus, unlike Kotteakos, where a number of peripheral defendants dealt separately with a single core defendant and did not know about nor were affected by the other defendants, Stanley could reasonably be found to have appreciated the scope of this cocaine distribution conspiracy.
 
 
 43
 In addition, unlike the situation in Kotteakos, the principal members of the conspiracy, including Stanley, were aware of and dealt with many of the other conspirators. David Jones, one of Stanley's retailers, was known to both Stanley and Tanceusz. Gary Petroni, one of Tanceusz's retailers, met Stanley through Tanceusz as early as 1976, although he sold drugs only for Tanceusz. Kathy Gallagher, who helped distribute Tanceusz's drugs, knew Stanley and delivered cocaine directly to him on occasion. Mark Nowicki, Tanceusz's partner at one time, dealt with both Tanceusz and Stanley at various times during the conspiratorial period. This was not a case of a defendant in a 'rimless wheel' conspiracy unaware of the existence of any of the alleged coconspirators. In this case, the core conspirators, including Stanley, dealt regularly with one another, relied on one another, and benefited from their mutual dealings.[3] The jury could therefore properly conclude that the evidence established a single conspiracy, not the multiple conspiracies claimed by Stanley.
 
 
 44
 Defendant argues that the government's evidence did not establish the existence of a conspiracy involving Stanley until 1978 while the indictment stated that the conspiracy began in 1972. He also contends that the government's evidence went beyond the allegations in the indictment because more than one supplier of coaine was shown to have participated in the conspiracy instead of Toscano alone.[4] These claimed 'variances' are not material taken in context with the totality of circumstances. Appellant discovered the evidence with regard to the conspiracy's time frame and the individuals alleged to be members of the conspiracy and their respective roles before trial. He has demonstrated no prejudical surprise. These claimed variances of proof did not prevent him from receiving a fair trial. See United States v. Miller, 105 S.Ct. 1811, 1814 (1985).
 
 
 45
 Another variance is alleged to have occurred because the government introduced as evidence drug transactions between Stanley and Hal Hassenfrantz. Stanley contends also that evidence of these drug transactions established a conspiracy separate from any conspiracy between Stanley, Hassenfrantz, and those individuals charged in the indictment. It is reasonable, however, under the evidence to infer that Hassenfrantz's name appeared on telephone lists kept by Stanley, Tanceusz, and Toscano in the same code, thus permitting a finding that Hassenfrantz was involved in the same conspiracy. Even if Hassenfrantz dealt principally with Stanley, that determination would not require that the transactions between Hassenfrantz and Stanley be regarded as part of a separate conspiracy. Thus, we find no prejudicial, material variance to have occurred and hold that the evidence is sufficient to support Stanley's conviction.
 
 
 46
 IV. Court's Jury Instruction on Multiple Conspiracies
 
 
 47
 At trial defendant requested the following jury instruction on multiple conspiracies with emphasis on the unanimity required:
 
 
 48
 Count Two of the indictment charges that the conspiracy to possess with intent to distribute cocaine and distribution began on or about late 1972 and thereafter was continuously carried out until approximately June, 1982. You need not find that the conspiracy lasted the entire period from late 1972 to June, 1982, in order to find the existence of a conspiracy. However, you must unanimously find a single conspiracy which existed between unanimously agreed upon dates, and that such a conspiracy was the overall scheme charged in the indictment. Thus, unless and until you can unanimously agree on inclusive dates for a single conspiracy in which a particular defendant participated, and further unanimously agree that such a conspiracy was the single overall scheme charged in the indictment, you must acquit the defendant.
 
 
 49
 Although agreeing to give an instruction on multiple conspiracies, the district judge declined to give defendant's proposed instruction, but rather instructed the jury:
 
 
 50
 [T]he Indictment charges the Defendant with a single conspiratorial scheme to possess with intent to distribute and distribution of cocaine which is alleged to have occurred continuously between approximately late 1972 until approximately June, 1982. You must find that the same conspiratorial scheme that is charged in the Indictment is the one which in fact existed and in which this Defendant participated in order to convict this Defendant.
 
 
 51
 Thus, even if you find a Defendant did participate in a particular conspiracy, but that conspiracy differed from and was not the overall specific scheme charged in the Indictment, you must acquit that Defendant. This is so even if you find that some of the Defendants conspired together in a different conspiracy. You need not find that the conspiracy lasted the entire period from late 1972 to June, 1982, in order to find the existence of a conspiracy which existed between dates, and that such a conspiracy was the overall scheme charged in the Indictment. In sum, you must find beyond a reasonable doubt that the charged conspiracy as set forth in the Indictment existed between specific dates included within those charged in the Indictment and that Defendant Stanley was a member of such conspiracy.
 
 
 52
 Defendant agrees that the 'instruction in itself' is not improper; he argues, however, that it failed to specifically explain the unanimity that must occur, citing United States v. Echeverry, 698 F.2d 375 (9th Cir.), modified, 719 F.2d 974 (1983). Echeverry, however, does not require the instruction offered by this defendant. In this case, distinguishing the situation from Echeverry, no showing was made as to the likelihood of confusion to the jury. We find no error in the use of the trial court's instruction.
 
 
 53
 V. Alleged Prosecutorial Misconduct--Vouching for Government Witnesses
 
 
 54
 Another assignment of error involves testimony elicited by the government from informants under grant of immunity testifying against Stanley. Following the testimony of one of the government's witnesses, defendant objected to the government eliciting any testimony about the terms of the government witnesses' immunity or plea agreements. The court asked whether defense counsel intended to bring out on cross-examination the fact that the witnesses were testifying under immunity, and defense counsel replied that that depended 'upon the context of each witness.' The court then said that if defense counsel would agree not to impeach the witnesses on the ground that they were testifying under immunity, the court would direct the government not to bring out the terms of the immunity agreements. When defense counsel declined that offer, the court refused to bar the government from eliciting the terms of the cooperation agreements.
 
 
 55
 The prosecutor then asked each of the government witnesses about the terms of his plea or immunity agreement, including a promise to testify truthfully. On cross-examination of each of the principal government witnesses, Nowicki, Jones, and Seaver, defense counsel attempted to impeach the witnesses by questioning them about favorable aspects of their immunity or plea agreements with the government.
 
 
 56
 In presenting this argument, defendant relies principally on United States v. Roberts, 618 F.2d 530 (9th Cir. 1980), aff'd, 640 F.2d 225 (9th Cir.), cert. denied, 452 U.S. 942 (1981), which stated in dicta that eliciting from a government witness that a promise to testify truthfully, a condition to the grant of immunity, was improper vouching of that witness' credibility. Other courts have questioned such rule, and we do not find it persuasive. See, e.g., United States v. McNeill, 728 F.2d 5, 14 (1st Cir. 1984); United States v. Brown, 720 F.2d 1059, 1073-74 (9th Cir. 1983); United States v. Tham, 665 F.2d 855, 861-62 (9th Cir. 1981), cert. denied, 456 U.S. 944 (1982); United States v. Creamer, 555 F.2d 612, 617-18 (7th Cir.), cert. denied, 434 U.S. 833 (1977); United States v. Koss, 506 F.2d 1103, 1111, 1113 (2d Cir. 1974), cert. denied sub nom., Layne v. United States, 420 U.S. 977 (1975).
 
 
 57
 We find no error under the circumstances in the district court's ruling and in the prosecutor's actions.
 
 
 58
 Defendant also argues that the district court erred by not instructing the jury, as he requested, that the witnesses' immunity agreements should not be construed as evidence of the facts set out therein. The court instead gave the jury a detailed instruction regarding the need to examine the testimony of immunized witnesses with great care. The court advised the jury that it should 'consider whether the testimony [of immunized witnesses] may be colored in such a way as to further the witness' own interest, for a witness who realizes that he may procure his own freedom by incriminating another has a motive to falsify.' We find that instruction sufficient to apprise the jury of the possible bias of the immunized witnesses, and it served to overcome any suggestion that those witnesses should be accorded special credence because of the terms of their immunity agreements. See United States v. Tham, 665 F.2d at 861-62. Stanley's requested instruction was accordingly unnecessary.
 
 
 59
 VI. Refusal to Strike Testimony of Four Government Witnesses
 
 
 60
 Defendant's final assignment of error rests on the district judge's refusal to strike the testimony of three government witnesses as well as tape recorded conversations between Tanceusz and Charles Mark on various evidentiary grounds. We find no error by the district court in admitting this testimony and decline defendant's suggestion that we reject our decision in United States v. Vinson, 606 F.2d 149 (6th Cir. 1979), cert. denied, 444 U.S. 1074 (1980), as unconstitutional.
 
 
 61
 For the foregoing reasons, we AFFIRM defendant's conviction.
 
 
 
 [1]
 We likewise find that appellant's other attacks on the facial validity of the warrant are without merit
 
 
 [2]
 Stanley has standing to challenge the validity of the extension order as an 'aggrieved party' under 18 U.S.C. Sec. 2518(10)(a) and (11) (1970 & Supp. 1985) because he was a participant in some of the telephone conversations intercepted pursuant to the court ordered wiretap. See Anthony v. United States, 667 F.2d 870, 877-78 (10th Cir.), cert. denied, 457 U.S. 1133 (1982); United States v. Abascal, 564 F.2d 821, 825 (9th Cir. 1977), cert. denied sub nom., Frakes v. United States, 435 U.S. 942 (1978); United States v. Fury, 554 F.2d 522, 525 (2d Cir. 1977), cert. denied, 436 U.S. 931 (1978); United States v. Bellosi, 501 F.2d 833, 841-42 (D.C. Cir. 1974)
 
 
 [3]
 The evidence showed that coconspirators Charles Mark and Paul Toscano, who supplied Tanceusz with cocaine, were also aware of Stanley's role in the conspiracy. In the recorded conversations with Mark and Toscano, Tanceusz was overheard referring to Stanley by his first name, indicating that the parties were familiar with Stanley. In the first conversation, Tanceusz referred to Stanley in the course of a discussion of law enforcement surveillance activities. In the second conversation, he referred to Stanley as the person from whom he intended to obtain money to give to Mark, so that Mark could pay Tanceusz's creditors in Florida
 
 
 [4]
 Stanley also challenges the indictment because he claimed that Toscano was not shown to have been involved in the conspiracy prior to 1982. However, when Toscano was arrested in Massachusetts in early 1980, he possessed a list of telephone numbers written in exactly the same code that was found in searches of the homes of Stanley and Tanceusz. It also contained the telephone numbers of coconspirators Tanceusz, Charles Mark, another participant in Stanley's drug business. This was adequate basis for the jury to conclude that Toscano had already joined the conspiracy at least as early as 1980