810 F.2d 203
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Perry DeWayne CAUDLE (85-5988), Freddy Douglas Montgomery
(85-6011), Defendants-Appellants.
 Nos. 85-5988, 85-6011.
 United States Court of Appeals, Sixth Circuit.
 Nov. 14, 1986.
 
 Before KENNEDY and MARTIN, Circuit Judges, and PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Perry Dewayne Caudle and Freddy Douglas Montgomery appeal jury verdicts convicting them on eight counts relating to the armed robberies of two banks in Tennessee, one on October 23, 1984 in Clarksville, and the other on June 28, 1985 in St. Bethlehem. Both defendants raise multiple assignments of error. As to Montgomery all are without merit and we affirm. However, the evidence identifying Caudle as a participant in the crimes of September and October of 1984 was insufficient, and therefore we reverse as to him on counts two, three, four and seven. In addition, we find that because of the weakness of this evidence, Perry Dewayne Caudle was improperly convicted of participation in a single conspiracy. Thus there was a prejudicial variance between the indictment and the proof as to Caudle and we reverse his conviction on count one. We affirm as to counts five, six, and eight and remand for resentencing on these counts.
 
 
 2
 On September 14, 1984, deputy sheriff Freddie Maxwell, of the Montgomery, Tennessee, County Sheriff's Department, responded to a call reporting that three black males were engaged in suspicious activity. He came upon three black males wearing Army fatigues. When he asked for identification, they responded that it was in their car, which had broken down and was parked down the road. Maxwell asked them to return to their car while he followed. At some point along the way, Maxwell lost sight of the men and they disappeared. He was unable to find them, but happened upon a late-model Ford Thunderbird further down the road. He soon learned over his police radio that the car had been reported stolen the night before. He then searched the car and found a paper bag containing three full-face rubber halloween masks and another bag containing a can of a substance for use in spray-tinting car windows. The windows of the car had been tinted, and the owner later testified that the windows were not tinted when the car was stolen, nor had he left a spray can or masks in the car. Fingerprints on the spray can bag were later matched with Montgomery's prints.
 
 
 3
 That same morning, in an area approximately two miles from where the stolen Thunderbird was found, three black men stole a Dodge Ram pick-up truck. David Smith, an acquaintance of the owner, noticed the men driving the truck at a high rate of speed. Smith was not asked at trial whether he could describe any of the men in the truck (other than their race) or whether he saw any of the three men in the courtroom.
 
 
 4
 On October 20, 1984, a black man stole a 1974 white Oldsmobile from Elgie Youngblood at gunpoint. Youngblood was not asked if he could provide a more detailed description. On October 23, 1984, three men arrived at the Commerce Union Bank in Clarksville in a car, later identified as Mr. Youngblood's Oldsmobile. The men were fully clothed in Army fatigues, full-face halloween masks, mirrored sunglasses and work gloves. One of the men was wearing an Army flak jacket. Two men were carrying sawed-off shotguns and the third was carrying a .30 caliber M-1 assault carbine. They proceeded to rob the bank by ordering one of the bank employees to fill a green duffel bag with money from the vault. At one point, the employee was able to see one of the robber's arms and noticed that the skin was black.
 
 
 5
 After the robbery, the Oldsmobile was found near a saw mill, and some tracks from the car led to some of the stolen money, which apparently had been abandoned. The windows of this car had been tinted, and some hairs were found in the car. The government's hair analysis expert testified at trial that at least one of the hairs shared some of the characteristics of a sample of Montgomery's hair, and the same was true of another of the hairs found and a sample of Caudle's hair.
 
 
 6
 The government introduced evidence that during the ensuing months Caudle and Montgomery purchased some motorcycles with cash and that Caudle made a $900 cash downpayment on a car.
 
 
 7
 In May 1985, the F.B.I. received information that Clem Henderson, Montgomery's cousin, had some information regarding the September 1984 theft of the Thunderbird and the October 1984 bank robbery. Henderson, apparently fearing that somehow he could be linked to these crimes, agreed to cooperate. At trial, Henderson testified to the following. He was approached by Montgomery in September 1984 and asked if he would like to help rob a bank. Montgomery told Henderson that he was one of the three men stopped by officer Maxwell in September 1984, and after the October 1984 robbery Montgomery said he was one of the men involved. Henderson helped Montgomery obtain some 7 millimeter ammunition for the June 1985 robbery. Henderson wanted to participate in both robberies but was not allowed to. The government did not attempt to elicit any statements from Henderson that indicated Caudle's involvement.
 
 
 8
 Henderson's cooperation took the form of keeping the F.B.I. informed of Montgomery's plans to rob another bank. On June 27, 1985, Henderson told the F.B.I. that Montgomery would be robbing a bank in Hopkinsville, Kentucky, the next day. That night, two cars were stolen from a car dealer in Cadiz, Kentucky. One of those cars was used in the June 28 robbery, but it was the Commerce Union Bank in St. Bethlehem that was robbed. The three men were wearing full-face halloween masks, work gloves and mirrored sunglasses. One man was wearing a loose-fitting jacket. A teller was directed to the vault and helped one of the robbers fill a duffel bag with money. He noticed that the robber's skin was black. The getaway car was positively identified as one of the cars stolen the night before. The car was later found in a ditch and inside the car was a pair of mirrored sunglasses with traces of "hair" fibers that later matched with the hair of one of the halloween masks.
 
 
 9
 A manhunt was launched in an effort to find the robbers. Robert Hunt, a Clarksville policeman, responded to a report that a resident had seen two individuals dressed in camouflage in the area. Hunt investigated with the help of a tracking dog and deputy Jim Worthington. Eventually, Worthington spotted Caudle sitting in an area of thick underbrush. He ordered Caudle to remain still while Hunt released the tracking dog. Hunt then moved in to apprehend Caudle, who was carrying a duffle bag and a pistol. As Hunt reached in to get Caudle's weapon, McKee held a rifle to Hunt's back and told Hunt to drop his weapon. Hunt spun around and attempted to shoot McKee. Hunt's weapon did not fire, so he knocked McKee's weapon, a .30 caliber carbine, from McKee's hand and ran a few steps before jumping to the ground. Worthington then fired two shots at McKee, one of which was fatal.
 
 
 10
 Both McKee and Caudle were dressed in camouflage outfits and McKee was also wearing an Army flak jacket. At Caudle's arrest, the police seized his pistol, the carbine, and a .30 caliber assault-type carbine, as well as two duffle bags containing the money from the bank, a jacket, and halloween masks, all of which were later identified by one of the tellers. Montgomery turned himself in the following day.
 
 
 11
 Having disposed of the 1985 robbery at St. Bethlehem, Tennessee, we turn now to the evidence offered to prove that Caudle was a participant in the 1984 robbery of the bank at Clarksville, Tennessee. A different pattern emerges from testimony at trial regarding this robbery. Officer Maxwell, the deputy sheriff who encountered three black males on a road in September 1984, testified that one of the persons present in the courtroom, who was identified for the record as Caudle, "appears to be one of the individuals also, but I cannot positively say." He had previously said that the person whom he identified as Caudle at trial had hispanic features. He also testified that a little over a month after the September 1984 encounter, he was taken to a location to observe McKee and Caudle and asked if they were two of the three he had encountered. He said then that the features and build were similar, but that he "could not positively say they were the two individuals [he] had made contact with." In fact, he testified that he told the F.B.I. agents at that time that he did not believe Caudle was one of the ones he encountered. He also testified that he certainly would have recalled him if he were the one he had seen. Thus, we believe that his identification is too tenuous to permit a finding that Caudle was a participant in the Clarksville robbery.
 
 
 12
 The only other evidence connecting Caudle to the prior crimes is a hair found in the getaway car, (the Oldsmobile), from the first bank robbery. The government's witness, Mr. Blythe, of the F.B.I.'s Forensic Science Laboratory, testified that he examined eight hairs for comparison to samples from Caudle and Montgomery. One of the hairs "exhibited the same microscopic characteristics as those in the known hair sample of Mr. Caudle." When asked whether there was anything in the samples that was inconsistent with them being from the same individual, he testified:
 
 
 13
 No sir, there was not. Had there been things that were inconsistent, my suspicions would have been aroused that it didn't come from one of these individuals and I would have expressed that opinion.
 
 
 14
 Though Caudle's objection to the admissibility of this evidence was not appropriate, the evidence itself is not strong enough to show that Caudle was ever in that car. Blythe himself testified that "[u]nlike fingerprint examination, hair examination is not absolute, positive identification. I can't say a hair came from a particular person to the exclusion of all other people. But generally hairs from people don't look alike. Just as people tend to be different, hairs tend to be different." When asked about other hair analysis techniques, he stated: "There've been a number of techniques, as you stated, that have been explored for--as being able to make positive assertions with hairs. That is to say this hair came from this person and nobody else. That would be nice to do it, but we can't do it yet."
 
 
 15
 The defense offered its own witness on this issue, Dr. Raymond Hart, president and director of a microanalysis research group. He testified that Caudle's hair sample had a unique characteristic that he had never seen in eleven years of hair analysis, and that he did not find this or a certain other prominent characteristic from Caudle's hair sample in the strand of hair found in the Oldsmobile. He thus expressed an opinion that none of the hairs found in the Oldsmobile "were definitely compatible with" Caudle's hair samples, although some did have the same general characteristics. He also said he would not be comfortable making a comparison based upon one hair sample.
 
 
 16
 Because hair samples do not provide the same positive identification as fingerprints, and the testimony of Office Maxwell waivered, it appears that the jury's conviction of Caudle for the earlier crimes was based on his participation in the later crimes and the similarity of the modus operandi. Even viewing the evidence in the light most favorable to the prosecution, we find that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). We therefore reverse on the following counts: Count Two, alleging violation of 18 U.S.C. §§ 2312 and 2, transporting a stolen motor vehicle, (the 1970 Ford Thunderbird), in interstate commerce on or about September 14, 1984; Count Three, again alleging violation of 18 U.S.C. §§ 2312 and 2 for transporting a 1982 Dodge Ram pickup truck on or about September 14, 1984; Count Four, violating 18 U.S.C. § 2113(d), taking money belonging to the Commerce Union Bank in Clarksville, Tennessee, from its employees by force, violence, and intimidation, assaulting them by use of a dangerous weapon, on or about October 23, 1984; and Count Seven, violating 18 U.S.C. § 924(c), carrying a firearm while robbing the Commerce Union Bank in Clarksville, Tennessee on or about October 23, 1984.
 
 
 17
 Caudle does not challenge his convictions on counts five, six, or eight on appeal. He admits that there was sufficient evidence to find him guilty of transporting the stolen getaway car on June 28, 1985, robbing the bank that day, and carrying a firearm during the robbery. He does however challenge the conspiracy count, (count one), and claims that there was a variance between the indictment and the proof at trial. Specifically, he argues that the indictment alleges one conspiracy, (to steal cars and rob banks), while the proof showed, at best, multiple conspiracies. He claims that the only conspiracy the evidence shows he could have been involved in is a conspiracy to rob the second bank, and to steal the automobiles needed for the robbery.
 
 
 18
 Leaving aside for a moment the question of whether the crimes involved here are the result of one or two conspiracies, we find that the record makes it clear that Caudle's presence as a member of the conspiracy could not be established prior to June of 1985. However, if a single conspiracy were established Caudle might still be held liable for previous crimes committed in furtherance of the conspiracy. See United States v. Gravier, 706 F.2d 174, 177-78 (6th Cir.1983). In this situation, however, the conspiracy theory becomes problematic. With one fewer common member of the original group, the crimes look more like separate events rather than elements of one large conspiracy. Other than the evidence previously mentioned showing that the robberies were conducted in a similar manner, there is no evidence, direct or otherwise, that the individuals who committed the first crimes, (presumably McKee, Montgomery and an unidentified third person, with the possible assistance of Henderson), joined together for the purpose of committing more than one bank robbery. The overt acts of this alleged conspiracy, unlike those of drug conspiracies, for example, are not interdependent; no overall plan is jeopardized by the nonoccurrence of one of the bank robberies. Cf. United States v. Warner, 690 F.2d 545, 549 (6th Cir.1982). The only apparent connection between McKee and Montgomery was that they committed two bank robberies together. Thus, the evidence indicates two conspiracies rather than one.
 
 
 19
 If an indictment alleges one conspiracy but the evidence only supports a finding of multiple conspiracies, then a variance exists which is reversible error if Caudle can show he has been prejudiced thereby. Warner at 548. Though Caudle's brief does not go into great detail on the issue of prejudice, he does argue that his guilt as to the earlier crimes was imputed from the evidence relating to Montgomery's activities. This, coupled with the possibility that it was the "single conspiracy theory" which led to his conviction for the earlier crimes, constitutes sufficient prejudice to warrant reversal. Reversal is required if the court "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." United States v. Snider, 720 F.2d 985, 989 (8th Cir.1983), cert. denied, 104 S.Ct. 1613 (citing Kotteakos v. United States, 320 U.S. 750, 765 (1946)). The mere fact that the jury convicted Caudle on the basis of so little evidence is clear proof of prejudice. Therefore we find we must also reverse as to Caudle on count one, the conspiracy count, and all of its subparts.
 
 
 20
 We do not find it necessary to discuss all of the other issues raised by the defendants. The only arguments made by Montgomery involve double jeopardy, which, after Missouri v. Hunter, 459 U.S. 359 (1983), are foreclosed. Therefore, we affirm on all eight counts against Montgomery.
 
 
 21
 As for Caudle, we affirm on count five, the violation of 18 U.S.C. § 2113(d) for the robbery of the Commerce Union Bank in St. Bethlehem, Tennessee on or about June 28, 1985. We affirm as to count six, violation of 18 U.S.C. §§ 2312 and 2, transporting a stolen motor vehicle (the 1975 Chevrolet) in interstate commerce on or about June 28, 1985. We also affirm on count eight, the violation of 18 U.S.C. § 924(c), for using and carrying a firearm while committing the St. Bethlehem bank robbery on or about June 28, 1985.
 
 
 22
 We remand this case to the district court for the resentencing of Perry Dewayne Caudle in accordance with this opinion.